**MONSANTO COMPANY and The Nutrasweet Company,**
Plaintiffs,

v.

**HASKEL TRADING, INC.,**
**et al., Defendants.**

**No. 97–CV–0150 (JG).**

United States District Court,
E.D. New York.

June 30, 1998.

Rodney A. Brown, Brown & Fox, P.C., New York City, for Monsanto Co. and Nutrasweet Co.

Bernard Malina, Malina & Wolson, New York City, for Wholesale Exchange and Ely Baum.

Simon B. Gluck, Brooklyn, NY, for Haskel Trading Inc. and Cheski Baum.

## AMENDED MEMORANDUM AND ORDER [1]

GLEESON, District Judge.

This action alleges trademark infringement and other wrongdoing in violation of the Lanham Act and New York statutory and common law. On August 11, 1997, the plaintiffs moved for summary judgment and for an order adjudging certain defendants in contempt of a Temporary Restraining Order issued by this Court on January 13, 1997. On October 7, 1997, the defendants crossmoved for summary judgment and for leave to file an amended answer. On October 15, 1997, the defendants filed an additional motion seeking an order returning much of what was seized pursuant to several seizure orders this Court issued, as well as modification of a preliminary injunction I entered on March 14, 1997.

For the reasons set forth below, all parties' motions for summary judgment and the plaintiffs' motion for an order holding defendants in contempt are denied. The defendants' motion for leave to file an amended answer is granted. The defendants' motion for an order returning much of what was seized pursuant to the seizure orders is granted. With respect to the defendants'

request for modification of this Court's March 14 preliminary injunction, a hearing is necessary on the defendants' claim of unreasonable delay by the plaintiffs.

## BACKGROUND

Monsanto Company ("Monsanto") is a manufacturer and distributor of the artificial sweetener known as Equal. Monsanto markets and sells Equal in packages bearing the federally registered trademarks "NutraSweet" and "Equal," trademarks which are owned by Monsanto's subsidiary The Nutra-Sweet Company ("NutraSweet"). According to the plaintiffs, since 1992 they have spent more than $110 million in advertising and promoting the Equal product, with net sales of over $600 million during that period.

The plaintiffs market Equal in two distinct channels of commerce: retail sales and institutional sales. The product is packaged differently for each channel: the institutional cartons contain 2000 packets of Equal; the retail cartons contain 50 to 100 packets.

The plaintiffs allege that, after an investigation that began in 1996, they discovered that defendants Ely and Cheski Baum, acting on behalf of defendants Haskel Trading ("Haskel") and Wholesale X–Change ("Wholesale"), were repackaging sweetener from the plaintiffs' institutional cartons into retail boxes constructed by the defendants. Because the price-per-packet of Equal is lower for the institutional boxes than for the retail boxes, the defendants were able to resell the repackaged product at a higher price than they paid for it. The retail boxes the defendants constructed were similar in all material respects to the plaintiffs' retail boxes. The boxes carried the words "Distributed by: The NutraSweet Company." They made no mention of the defendants' role as repackagers.

In addition to their reboxing operation, the defendants also repackaged Equal packets into clear plastic packages. Unlike the boxes, the plastic packages contained paper inserts stating that the sweetener had been

---

1. This Amended Memorandum and Order amends a Memorandum and Order I issued on February 18, 1998. Since the February 18 Memorandum and Order, the parties to whom this Memorandum and Order relates entered into, by consent, a Revised Preliminary Injunction, which governed their actions up until the date of trial. They thereafter settled.

repackaged by the defendants.[2] Because the plastic packages were transparent, the paper inserts identifying the defendants as repackagers could be seen from outside the package.

On January 13, 1997, the plaintiffs filed a complaint alleging, *inter alia,* that the defendants' reboxing operation violated the Lanham Act. On three different occasions thereafter, the plaintiffs, acting pursuant to orders issued by this Court, seized evidence of the defendants' repackaging operations. On March 12, 1997, the plaintiffs filed a First Amended Complaint, which named, *inter alia,* Ely and Cheski Baum, Haskel, and Wholesale as defendants. On March 14, 1997, by consent of the parties, I entered a preliminary injunction enjoining the defendants from, *inter alia,* dealing with packaging "bearing a copy or colorable imitation of the Equal and/or NutraSweet trademarks."

On August 11, 1997, the plaintiffs filed the instant motion for summary judgment. Although the plaintiffs state that they seek to hold the defendants liable for repackaging the Equal product in the clear plastic containers (on the ground that the paper insert does not indicate the defendants' role as repackagers prominently enough), that claim is not at issue here. Rather, the plaintiffs have moved for summary judgment only with respect to the defendants' reboxing operation. Specifically, they seek injunctive and monetary relief for trademark infringement in violation of Section 32 of the Lanham Trademark Act ("Lanham Act"), 15 U.S.C. § 1114, for false descriptions and representations in commerce under Section 43 of the Lanham Act, 15 U.S.C. § 1125, and for injury to business reputation and dilution of their mark in violation of New York General Business Law § 368–d. The plaintiffs also seek compensatory and punitive damages for unfair competition in violation of New York common law and compensatory damages under a theory of unjust enrichment. As noted above, plaintiffs' August 11 motion seeks an order holding the defendants in contempt of

the Temporary Restraining Order I entered on January 13, 1997.

On October 7, 1997, the defendants' cross-moved for summary judgment and for leave to file an amended answer. On October 15, 1997, the defendants filed an additional motion seeking an order returning much of what was seized pursuant to the seizure orders I issued, as well as modification of the March 14 preliminary injunction.

## DISCUSSION

### I. The Motions for Summary Judgment

#### A. The Summary Judgment Standard

Summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining when material facts are in dispute, all ambiguities must be resolved and all inferences drawn in favor of the non-moving party. *See Local 74, Serv. Employees Int'l Union v. Ecclesiastical Maintenance Servs.,* 55 F.3d 105, 108 (2d Cir.1995).

The initial burden is upon the moving party to demonstrate the absence of any genuine issues of material fact. *See Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party cannot survive a properly supported motion for summary judgment by

---

**2.** For example, one of the packages distributed by the defendants stated as follows:

These genuine Equal® Sweetener packets are repackaged for your retailer by World Distributors. World Distributors. is not an "authorized" Equal® dealer or reseller. It is not affiliated or connected in any way with The NutraSweet Company. The NutraSweet Company has not authorized World Distributors, to repackage these packets.

resting on his pleadings "without 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### B. *The Lanham Act Claims*

#### 1. *The Proper Defendants*

■ Before addressing the substance of the parties' claims, I first must determine who the proper defendants are. Ely Baum and Wholesale do not deny their participation in the reboxing operation. Cheski Baum and Haskel, however, do. In addition, Cheski and Haskel argue that the plaintiffs may not pierce the corporate veil in order to hold Ely and Cheski liable for any Lanham Act violations that may have occurred.

The plaintiffs have submitted documentary evidence tending to suggest that Cheski and Haskel participated in the reboxing operation. For example, the plaintiffs have submitted a copy of an invoice sent to Cheski for services performed in connection with designing copies of the plaintiffs' boxes. *See, e.g.*, Ex. M(4). The plaintiffs also have submitted a letter, signed by Ely on Haskel letterhead, which suggests that Ely played a role in the management of Haskel. *See, e.g.*, Ex. U(11). In response to this evidence, Cheski states in an affidavit that, although Haskel is his company, neither he nor Haskel have any relationship with Wholesale. *See* C. Baum Aff. at ¶¶ 5–6. Accordingly, genuine issues of fact exist with respect to the role of Cheski and Haskel in the reboxing operation. The plaintiffs' request that I find as a matter of law that Cheski and Haskel participated in the reboxing operation is therefore denied.

■ Cheski also has argued that the plaintiffs may not pierce the corporate veil in order to hold him or his brother liable for any Lanham Act violations. However,

"[w]hile a corporate officer is not necessarily individually liable for torts committed on behalf of the corporation, personal liability for trademark infringement and unfair competition is established 'if the officer is a "moving, active conscious force behind [the defendant corporation's] infringement."'" *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913 (E.D.N.Y.1988) (citation omitted); *see also Project Strategies Corp. v. National Communications Corp.*, 948 F.Supp. 218, 224 (E.D.N.Y.1996). As stated above, Ely has not denied his participation in the reboxing operation. Accordingly, he can be held personally liable for any violation the plaintiffs may establish. Cheski's role in the operation, however, remains disputed. Whether Cheski may be held personally liable for any such violation therefore must await trial.

Since the role of Cheski and Haskel is not yet clear, in discussing the substance of the parties' claims, I shall use the term "defendants" with the understanding that resolution of the issue of whether that term includes Cheski and Haskel must await trial. Given that, in filing the instant motion, the plaintiffs have moved for summary judgment with respect to their claims against Cheski, Ely, Haskel, and Wholesale only, however, the term "defendants" does *not* include the remaining defendants sued by the plaintiffs.

#### 2. *The Plaintiffs' Claims*

In passing the Lanham Act, Congress recognized that "[e]very product is composed of a bundle of special characteristics" and that "[t]he consumer who purchases what he believes is the same product expects to receive those special characteristics on every occasion." *Societe Des Produits Nestle S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 636 (1st Cir.1992). Accordingly, the Lanham Act outlaws the unauthorized use of a trademark in such a manner as is likely to cause consumer confusion, mistake, or deception.[3] Although

---

**3.** Under Section 32 of the Lanham Act, an action for trademark infringement arises where "[a]ny person ... without consent of the registrant ... uses[s] in commerce any ... registered mark in connection with the sale ... of any goods [and] such use is likely to cause confusion [or] repro-

duce[s] a registered mark and appl[ies] such reproduction ... to packages ... in connection with which such use is likely to cause confusion." 15 U.S.C. § 1114(1). An action arises under Section 43 of the Lanham Act where "[a]ny person who, ... in connection with any

the original Lanham Act prohibited the use of a trademark in such a manner as to cause consumer confusion, mistake, or deception regarding the "source of origin" of the product only, courts have interpreted the most recent version of the Act to prohibit the use of a trademark so as to cause consumer confusion of any kind. *See United States v. Hon,* 904 F.2d 803, 807 (2d Cir.1990) (noting that "Congress's 1962 amendment of the 'likely to confuse' language in the Lanham Act 'evinc[ed] a clear purpose to outlaw the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely ... as to source of origin'" (citation omitted)), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 789, 112 L.Ed.2d 851 (1991).

In the instant case, the plaintiffs offer two alternative theories of the defendants' liability under the Lanham Act. According to the plaintiffs, the defendants' reboxing operation violates the Lanham Act because it creates the likelihood of confusion regarding the *quality* of the boxes the defendants construct or, alternatively, because it creates the likelihood of confusion regarding the *source* of those boxes. I will begin by discussing the plaintiffs' arguments regarding quality.

### a. *Quality*

The Lanham Act outlaws the use of a trademark in such a way as to confuse consumers as to the quality of the products they are purchasing. Confusion as to quality can occur in more than one way. For example, the Lanham Act outlaws the placement of an unauthorized trademark on an article that is of a lower quality than is the real product because such placement confuses the purchaser as to the quality of the product being purchased. *See, e.g., Societe Des Produits Nestle,* 982 F.2d at 636. In other words, the Lanham Act prohibits such unauthorized use of a trademark because it might lead the purchasers of goods to believe, falsely, that

the product they are purchasing came from the trademark holder and therefore that it is of the same quality as the "real thing."

■ The Second Circuit also has recognized that the distribution of the trademark holder's goods, bearing the trademark holder's mark, can violate the Lanham Act if the goods "do[ ] not meet the trademark holder's quality control standards." *Warner–Lambert Co. v. Northside Development Corp.,* 86 F.3d 3, 6 (2d Cir.1996). The trademark holder in *Warner–Lambert* had a policy of selling its cough drops within twenty-four months after their manufacture in order to ensure freshness. The Second Circuit held that where a drug store, despite that policy, sold the same cough drops more than twenty-four months after their manufacture, it violated the Lanham Act. *See id.* at 5–6. In support of its conclusion, the Second Circuit reasoned that distribution of a product which does not meet the trademark holder's quality control standards "may result in the devaluation of the mark by tarnishing its image." *Id.* at 6.

In the instant case, the plaintiffs' argue that the defendants' repackaging operation violates the Lanham Act because it deprives them of control over the quality of the products the defendants distribute and, as such, creates the likelihood of confusion regarding the quality of the retail boxes sold by the defendants. The defendants meet the plaintiffs' contentions by arguing that the plaintiffs are required to do more than merely allege that the defendants' repackaging scheme deprives them of control over the product. Rather, according to the defendants, the plaintiffs are required to prove that, by repackaging the product, the defendants undermined a quality control procedure established and maintained by the plaintiffs.

---

goods, or any container for goods, uses in commerce any ... symbol, or any false designation of origin ..., which ... is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods ... [or] misrepresents the nature, characteristics, [or] qualities of ... another person's goods." 15 U.S.C. § 1125(a)(1). "The elements required to succeed for trademark infringement under 15 U.S.C. § 1114 and for unfair competition under 15 U.S.C. § 1125 are

substantially the same." *Gucci America, Inc. v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1063 (S.D.N.Y.1991); *see also id.* at 1063 n. 3 ("The chief difference ... is that § 43(a) ... claims may be brought to enforce unregistered trademarks, while § 32 applies only to registered trademarks."). *Consequently, in this opinion,* I examine those claims together. Moreover, the parties do not dispute the plaintiffs' ownership of the Equal and NutraSweet trademarks.

■ In order to demonstrate that an infringer has violated the Lanham Act by distributing a product which does not meet the trademark holders' quality control standards, the trademark holder must present evidence regarding the quality control standards it maintains and regarding the ways in which the infringer's activities undermine those standards. *See id.* Specifically, to be entitled to relief, a trademark holder "must demonstrate . . . that: (i) it has established legitimate, substantial, and non-pretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." *Id.*

■ In the instant case, there exist genuine issues of material fact regarding whether, in packaging the Equal product, the plaintiffs maintained quality control procedures which were undermined by the defendants' subsequent reboxing of the product.[4] Resolution of this case on a motion for summary judgment is therefore inappropriate if the only theory on which the plaintiffs could prevail is their theory that the product the defendants distribute undermines their quality control procedures. Accordingly, I now turn to the plaintiffs' theory that the defendants' conduct created a likelihood of confusion as to source.

#### b. *Source*

The Lanham Act also outlaws the unauthorized use of a trademark in such a manner as is likely to cause confusion as to the source of the article bearing the trademark. Thus, in *Tanning, Research Laboratories, Inc. v. Worldwide Import & Export, Corp.,* 803 F.Supp. 606, 608–09 (E.D.N.Y.1992), the court held that the defendants violated the

Lanham Act by placing on their product a label which was substantially similar to that of the plaintiffs, thereby creating the risk that consumers purchasing the defendants' product would believe, falsely, that the product they were purchasing was manufactured by the plaintiffs.

■ The trademark holder who argues that an infringer's unauthorized use of a trademark is likely to cause confusion regarding a product's source is not required to make any showing regarding quality. A finding that there exists a likelihood of confusion regarding source is sufficient to establish liability under the Lanham Act. *See Tanning Research Laboratories,* 803 F.Supp. at 609 ("[The] assertion that plaintiffs must prove that defendants' unauthorized products were inferior . . . would turn the Lanham Act on its head. Congress hardly intended to step through the looking glass into a world in which valid trademark owners were only protected from inartful counterfeiters.").

■ The plaintiffs argue that the defendants' repackaging operation creates the likelihood of confusion regarding the source of the boxes the defendants distribute because (1) in outward appearance, the boxes constructed by the defendants are virtually identical to those the plaintiffs construct and (2) the boxes the defendants construct explicitly state that they are distributed by The NutraSweet Company. The defendants respond by arguing that the plaintiffs are in the business of selling sweetener, not boxes. According to the defendants, their actions did not create the likelihood of confusion as to source because at bottom they did nothing more than resell a product initially sold by the plaintiffs and, in so doing, represented

---

4. According to the plaintiffs, the boxes they distribute contain a "Lot Code" which allows them "to track the manufacture and packing of the product." Jackson Aff. at ¶ 14. The plaintiffs state that the Lot Codes "are designed to expedite recalls in the event of any problems with the health, safety, or freshness of food products." *Id.* at ¶ 16. The plaintiffs argue that the defendants' boxes, which are labeled with "bogus" Lot Codes, are inferior because they "prevent[ ] plaintiffs from tracking the date and place of manufacture of their product," thereby undermining their quality control procedures. The plaintiffs also argue that the product the defen-

dants distribute is inferior because, by rehandling the Equal product, the defendants "expose the consumer to increased hazards of defective machinery[,] . . . negligent handling [or] unsavory conditions, including infestations."

Under the holding in *Warner–Lambert*, the plaintiffs must do more than merely assert the existence of quality control procedures, as they have done here. Rather, they must prove that those procedures are legitimate, substantial, and non-pretextual, that they themselves follow the procedures, and that the distribution of the non-conforming product would diminish the value of their mark. *See Warner–Lambert,* 86 F.3d at 6.

correctly that the plaintiffs were the source of that product.

In my view, whether the defendants' actions in this case created a likelihood of confusion as to source depends on whether the "product" distributed by the plaintiffs consists solely of loose packets of sweetener or whether that "product" also includes the institutional and retail size boxes which the plaintiffs use to distribute those packets. *Cf. John Paul Mitchell Systems v. Pete–N–Larry's Inc.*, 862 F.Supp. 1020, 1025–26 (W.D.N.Y.1994) (noting "the difficulty in defining the parameters of what is 'the product itself'—for instance, whether such should include the bottle that contains a treating material, the information printed on such bottle, the box that in turn contains the bottle, the instructions placed in and printed on the box, or the carton that contains several of the boxes"). If the product consists only of the sweetener, there can be no question that the defendants' operation does not create a likelihood of confusion regarding source. After all, the sweetener the defendants distribute is, as the retail boxes the defendants construct indicate, manufactured and distributed (initially at least) by the plaintiffs. *See Prestonettes v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924) (Holmes, J.) (holding that defendant could reprint plaintiff's trademark in order to inform public that plaintiff's product formed a part of defendant's product); *see also Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir.1994) ("An action will not arise where the goods being sold are genuine goods bearing a true mark."). If, on the other hand, the "product" the plaintiffs distribute includes not just the sweetener but also the boxes in which the sweetener is distributed, then the plaintiffs have a strong argument that, by reboxing the loose packets of sweetener in boxes which they construct, the defendants have created a likelihood of confusion as to the source of part—although not all—of the product.

The boxes constructed by the plaintiffs serve several important functions beyond that of merely displaying the plaintiffs' trademarks. For instance, the boxes the plaintiffs distribute contain a "Lot Code" which allows them "to track the manufacture and packing of the product." Jackson Aff. at ¶ 14. According to the plaintiffs, those Lot Codes are important to the product because they "are designed to expedite recalls in the event of any problems with the health, safety, or freshness of food products." *Id.* at ¶ 16. The plaintiffs also use the boxes to inform members of the public as to how many individual packets of sweetener each box contains. That function is an important one, for the public certainly would view the plaintiffs' product with less favor if it knew that the plaintiffs were in the habit of occasionally placing only ten packets of sweetener in boxes which state that they contain twenty. The boxes also perform the function of serving as containers. Again, that function is one that is important to the product's image—the public would certainly think less of the plaintiffs' product if it knew that the occasional consumer discovered, upon opening the plaintiffs' boxes, that they contained, in addition to individual packets of sweetener, evidence of infestation.

The boxes constructed by the plaintiffs also are important to the plaintiffs because, inevitably, the quality of those boxes has an effect on the public's view of the quality of the plaintiffs' product generally. There is no question, for example, that, regardless of the quality of the sweetener contained inside the boxes, the public would purchase fewer of the plaintiffs' boxes—and/or pay less for those boxes—if it knew that the boxes were sealed with the help of toxic glue than it would if it had no such knowledge.

As the foregoing illustrates, the plaintiffs' boxes serve several important functions. There is therefore no question that the plaintiffs' retail and institutional boxes are an integral part of the "product" which they distribute. Accordingly, I find as a matter of law that, to the extent that the defendants distributed Equal product in boxes which, although constructed by the defendants, led consumers to believe that they were constructed by the plaintiffs, the defendants created a likelihood of confusion as to the source of part, albeit not all, of the product which

the defendants distribute.[5]

■ The only remaining question is whether I can determine whether the boxes the defendants constructed are so similar in appearance to the plaintiffs' boxes as to create the likelihood of confusion as to source on summary judgment, or whether that determination must await trial. The defendants have made no attempt to assert that the boxes they construct are visibly different in any material way from the boxes the plaintiffs' construct. In addition, the defendants'

boxes carry both the plaintiffs' trademarks and the words "Distributed by: The Nutra-Sweet Company" and make no mention of the defendants' role as repackagers. Consequently, anyone viewing the boxes could quite easily believe that they were constructed by the plaintiffs, and therefore that the plaintiffs are their true source. The undisputed facts therefore make clear that the boxes the defendants construct are likely to cause confusion as to their source. Accordingly, I find as a matter of law that, by distributing the Equal product in boxes

---

**5.** Although the Second Circuit described its holding in *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987), as one about quality control, that case provides support for my holding in this case. *See id.* at 393. There, the defendant Shoe World purchased and distributed shoes which bore a trademark owned by plaintiff El Greco. The shoes had been manufactured pursuant to a contract between El Greco and a company called Solemio, a contract which gave El Greco, through its agent, the right "to inspect the shoes before shipment in order to assure that they met El Greco's specifications and quality standards" and to withhold payment until its agent signed a certificate of inspection declaring that the merchandise had been approved for shipment in accordance with those specifications. *Id.* During the manufacturing process, El Greco became dissatisfied with Solemio's performance and, before issuing a certificate of inspection, canceled its order for two lots that Solemio had already manufactured. *See id.* at 394. Thereafter, Solemio sold the shoes, bearing El Greco's trademark, to Shoe World. *See id.* When El Greco discovered that Shoe World was selling the shoes, it brought suit against the company, alleging that such sales violated the Lanham Act. *See id.* The Second Circuit agreed. *See id.* at 396. The court began its opinion by noting that

> [o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of goods sold under the holder's trademark. For this purpose, the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.

*Id.* at 395 (citations omitted). The court thereafter found that "[t]he certificates of inspection required in this case were an integral part of appellant's effort at quality control." *Id.* at 395. According to the court, given the importance of the certificates of inspection, the fact that El Greco had not issued such a certificate with respect to the shoes sold by Shoe World precluded a finding that those shoes were genuine. *See id.* at 396.

Given *El Greco*, my holding in this case might arguably be described as a holding regarding

likelihood of confusion as to *quality:* by constructing the retail boxes, the defendants are performing an act usually performed by the plaintiffs, and in so doing, they are depriving the plaintiffs of control over that act. *See also Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir.1991) (noting that "Shell's quality control standards were an integral part of the bulk product identified by the marks" and holding that "*[w]ithout Shell's enforcement of its quality controls*, the bulk oil sold by Commercial was not truly 'genuine' " (emphasis added)), *cited with approval by Polymer*, 37 F.3d at 78. Alternatively, the holding in *El Greco* might better be described as one regarding likelihood of confusion as to *source:* until the certificate of inspection was issued, the shoes were not truly the "product" of El Greco, and any consumer purchasing the defendants' shoes might therefore be confused as to the source of those shoes. *See, e.g., Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 816 F.2d 68, 72 (2d Cir. 1987) ("The unauthorized disposition of the shoes without inspection [in *El Greco* ] deprived the owner of the right to control the product and could mislead consumers into believing that the trademark owner had approved the shoes for sale."), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987).

The latter recharacterization of *El Greco* would explain the difference between the Second Circuit's statement in that case that the actual quality of a product which is alleged to create the likelihood of confusion as to quality is irrelevant, *see El Greco*, 806 F.2d at 395, and the seemingly contradictory statement in *Warner–Lambert* that, in order to prove that a defendants' actions have created a likelihood of confusion as to quality, the trademark holder must demonstrate not only that it has established and that it maintains legitimate quality control procedures, but also that the defendants' sales would therefore diminish the value of the mark, *see Warner–Lambert*, 86 F.3d at 6. As I already have stated, where a defendants' actions create a likelihood of confusion as to source, the court need not find that the defendants' product is actually inferior to the plaintiffs' product. *See Tanning Research Laboratories*, 803 F.Supp. at 609.

which they constructed but which bear the plaintiffs' trademark and do not mention their role as repackagers, the defendants created a likelihood of confusion as to the source of those boxes. *See Microsoft Corp. v. Grey Computer*, 910 F.Supp. 1077, 1088 (D.Md. 1995) ("Where ... the goods distributed by the Defendants are intentional copies and virtually identical to the trademark owner's goods, likelihood of confusion may be established at the summary judgment stage."); *Microsoft Corp. v. CMOS Technologies, Inc.*, 872 F.Supp. 1329, 1335 (D.N.J.1994) ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety. Under these circumstances, the likelihood of consumer confusion, mistake or deception is clear."); *Tanning Research Laboratories*, 803 F.Supp. at 609 (finding likelihood of confusion on motion for summary judgment). The defendants therefore created the likelihood of confusion as to part, albeit not all, of the product which they distribute.[6]

Although I find that the plaintiffs have established that the defendants' reboxing operation creates a likelihood of confusion as to source, because, as explained below, there remain genuine issues of material fact with respect to the defendants' affirmative defenses, summary judgment in favor of the plaintiffs is not appropriate at this time.

6. In so holding, I do not mean to imply that the Lanham Act prohibits all forms of repackaging. *See Prestonettes*, 264 U.S. at 369, 44 S.Ct. 350 (holding that defendant had not violated Lanham Act by repackaging plaintiff's product and using plaintiff's trademark to identify the source of the product prior to its repackaging); *Polymer*, 37 F.3d at 78 ("[R]epackaging of goods is not trademark infringement *if it does not deceive the public or damage the mark owner's good will.*" (emphasis added)). Where repackagers inform the public as to their role as repackagers, there is no fear that the public will be deceived as to the source of any part of the product. *See Prestonettes*, 264 U.S. at 369, 44 S.Ct. 350 ("If the defendant's rebottling the plaintiff's [product] deteriorates it and the public is adequately informed who does the rebottling, the public, with or without the plaintiff's assistance, is likely to find it out."). This case provides an excellent illustration of that principle. As I stated earlier, in addition to their reboxing operation, the de-

### 3. *The Defendants' Affirmative Defenses*

■ The defendants offer two affirmative defenses to the plaintiffs' allegations that they violated the Lanham Act. First, the defendants argue that the plaintiffs may not succeed in their claim of trademark infringement because they acquiesced in the defendants' reboxing operation. Second, the defendants maintain that the plaintiffs' requests for relief are barred by the doctrine of laches.

#### a. *Acquiescence*

In support of their contention that the plaintiffs acquiesced in the reboxing operation, the defendants note that the plaintiffs have encouraged them to repackage the Equal product in plastic containers. The defendants further allege that NutraSweet allowed the plaintiffs to return 300 cases which were left over from the defendants' reboxing and repackaging operation. According to Baum, "[i]f Equal had in fact objected to the repackaging, it would never have accepted the returned goods, much less issue a credit." E. Baum Aff. at ¶ 6. The defendants also contend that, in July of 1996, Ely Baum "was privy" to an e-mail that Brian Powell, whom Ely asserts was an employee of NutraSweet, had sent to Manuel Cardenas, an employee of Hunt–Wesson, a company which the defendants allege is an agent of the plaintiffs. *Id.* ¶ 6(a). According to Ely, Powell stated in

fendants also repackage Equal product in transparent plastic containers containing an insert which informs purchasers that the defendants, and not the plaintiffs, are responsible for distributing the product in the plastic containers. Assuming that, in so doing, the defendants identify their role as repackagers prominently enough, they have not infringed on the plaintiffs' trademarks. By the use of the inserts, the defendants have made the public aware that the defendants, and not the plaintiffs, are the source of the packaging. Accordingly, such repackaging does not create a likelihood of confusion as to source. Indeed, *the plaintiffs themselves have conceded as much* by declining to argue that the mere fact that the defendants repackaged the sweetener in transparent plastic containers makes out a violation of the Lanham Act. Rather, the plaintiffs have argued that, by repackaging the sweetener in transparent plastic containers, the defendants have violated the Lanham Act by failing to identify their role as repackagers prominently enough.

that e-mail that he was happy with the "numbers" that Haskel had engendered, but NutraSweet's Retail Division "was getting edgy and upset about the duplicated 'boxes' that were being distributed." *Id.* Powell asked Cardenas to tell Haskel "to keep a 'lower profile' on the repackaging and to tell Haskel that the boxes being repackaged [should] be sent to less sensitive areas." *Id.* Finally, the defendants allege that, in July of 1996, Steve DeGraves, a Vice President of NutraSweet, met with Cheski Baum to discuss the marketing of the Equal product. *See* C. Baum Aff. at ¶ 17. According to Cheski, DeGraves "advised [him] that the Retail Division was upset with the reproduction and duplication of Equal boxes ... but that Plaintiff would nevertheless continue to sell to [the defendants]." *Id.* DeGraves asked Cheski " 'to keep the sales quiet' and not 'to make too much noise.' "

■ The Second Circuit has held that a trademark owner may not assert a claim of infringement if he "conduct[s] himself as impliedly to assure [an alleged infringer] that he does not object" to that infringer's actions, and if the infringer has detrimentally relied on that assurance. *Dwinell–Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir.1943) (Hand, J.); *see also Richard Feiner & Co. v. Turner Entertainment Co., MGM/UA*, 98 F.3d 33, 34 (2d Cir.1996) ("An unreasonable delay [in bringing an action requesting preliminary injunctive relief in a case of copyright infringement] suggests that the plaintiff may have acquiesced in the infringing activity...."); *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir.) ("Acquiescence is an equitable defense that denotes active consent by a senior user to another's use of the mark."), *cert. denied,* —— U.S. ——, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996); *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir.1985) ("[A]cquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induces reliance by the defendant.").

As I already have held, the defendants' operation violated the Lanham Act not because they repackaged the Equal product, but rather because they repackaged the

product in counterfeit boxes and, in so doing, failed to inform the public as to their role as repackagers. The plastic containers themselves, however, are not counterfeit. Moreover, in distributing the Equal product in the plastic containers, the defendants informed the public as to their role as repackagers. Accordingly, by encouraging the defendants to distribute the Equal product in the plastic container, the plaintiffs did not acquiesce in the defendants' reboxing operation. To the extent that the defendants, in making their acquiescence defense, rely upon their allegation that the plaintiffs encouraged the sale of Equal product in transparent plastic containers, the defense is insufficient.

The defendants, however, also allege facts which, if true, tend to prove the plaintiffs' acquiescence in the reboxing operation. Specifically, Ely's allegation that a NutraSweet employee sent an e-mail to Hunt–Wesson stating, *inter alia,* that Hunt–Wesson should tell Haskel to keep a "lower profile" with respect to their reboxing operation and Cheski's allegation that a NutraSweet Vice President asked him to keep the sales of the boxes "quiet," suggest that the plaintiffs may have acquiesced in the defendants' reboxing operation.

Genuine issues of material fact remain with respect to the defense of acquiescence. Accordingly, I decline to grant the plaintiffs' motion for summary judgment. Because I already have determined that the defendants' actions created a likelihood of confusion, evidence of defendants' violation of the Lanham Act will be admitted at trial only to the extent that it tends to prove or disprove the plaintiffs' acquiescence in the defendants' reboxing operation.

#### b. *Laches*

■ "A party asserting the equitable defenses of laches must establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such delay." *King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992). The plaintiffs have submitted evidence tending to prove that they instituted the instant action on January 13, 1997, after discovering the defendants' reboxing scheme earlier that same month. Accordingly, the

plaintiffs argue that they cannot be charged with unreasonable delay. However, as noted, Ely Baum asserts that he "was privy" to a July 1996 e-mail in which a NutraSweet employee discussed the defendants' reboxing operation. That assertion, if believed, tends to prove that the defendants were aware of the operation prior to January of 1997. Because the facts regarding the plaintiffs' discovery of the defendants' operation appear to be in dispute, resolution of defendants' laches defense as a matter of law is inappropriate.

Given that genuine issues of material fact remain with respect to the defendants' assertion of the defense of laches, both parties may, in addition to presenting evidence regarding the defendants' acquiescence, also present evidence tending to prove or disprove the defense of laches.

### C. The Plaintiffs' State Law Claims

The plaintiffs also seek summary judgment on their state law claims. Specifically, the plaintiffs seek injunctive relief under § 368–d of New York's General Business Law, as well as monetary relief under the common law claim of unfair competition and under a theory of unjust enrichment.

The defense of acquiescence applies both to the plaintiffs' claims under New York's General Business Law § 368–d and to their claim of unfair competition. *See Cue Publishing Co. v. Colgate–Palmolive Co.*, 23 A.D.2d 829, 259 N.Y.S.2d 377, 378 (1st Dep't 1965) (plaintiff who acquiesced in defendants' actions was not entitled to relief under § 368–d of New York's General Business Law); *Estate of Hemingway v. Random House, Inc.*, 23 N.Y.2d 341, 296 N.Y.S.2d 771,

779–80, 244 N.E.2d 250 (1968) (plaintiff who acquiesced in defendants' actions could not recover under claim of unfair competition); *cf. Little India Stores, Inc. v. Singh*, 101 A.D.2d 727, 475 N.Y.S.2d 38, 41 (1st Dep't 1984) (plaintiff who delayed for over two years in seeking enforcement of preliminary injunction entered pursuant to § 368–d was not entitled to relief). Consequently, summary judgment as to those claims is inappropriate. In addition, the plaintiffs' claims under New York General Business Law § 368–d, as well as their claim of unjust enrichment, entitle the plaintiffs to the same relief as do their federal claims.[7] Thus, assuming *arguendo* that the plaintiffs defeat the defense of acquiescence and laches, the claim of unfair competition is the only state law claim which entitles the plaintiffs to a different measure of relief from that to which they are entitled under federal law.[8] Consequently, I will limit my discussion of the plaintiffs' state law claims to their common law claim of unfair competition.

"[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchases as to the origin of the goods.' " *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 249–50 (S.D.N.Y.) (citation omitted), *aff'd*, 923 F.2d 845 (2d Cir.1990). I already have found that the defendants' reboxing operation created a likelihood of confusion as to the source of the Equal boxes. Accordingly, the only remaining issue is whether, in conducting their operation, the defendants acted in bad faith.

7. Section 368–d of New York's General Business Law makes available only injunctive relief, to which the plaintiffs, if they prevail under the Lanham Act, would be entitled under 15 U.S.C. § 1116(a). In addition, in connection with their claim of unjust enrichment, the plaintiffs seek compensatory damages only. However, if they prevail on their Lanham Act claims, the plaintiffs, pursuant to 15 U.S.C. § 1117(a), would be entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."

8. The plaintiffs would be entitled to punitive damages under both federal law, *see* 15 U.S.C. § 1117(b), and the common law claim of unfair

competition, *see New York Racing Ass'n v. Stroup News Agency Corp.*, 920 F.Supp. 295, 304 (N.D.N.Y.1996). Pursuant to 15 U.S.C. § 1117(b), however, the punitive damages available under federal law are capped at "three times ... profits or damages, whichever is greater." Were the plaintiffs to prevail in their claim of unfair competition, they would be entitled to seek recovery of more than that amount. *See, e.g., New York Racing Ass'n*, 920 F.Supp. at 304 (finding that plaintiff had proven unfair competition claim and therefore was entitled to an award consisting of double the profits and damages that court already had trebled under 15 U.S.C. § 1117(b)).

■ "Any inquiry into a defendant's alleged bad faith ... necessarily entails 'a factual inquiry.'" *Castle Rock Entertainment v. Carol Publishing Group, Inc.*, 955 F.Supp. 260, 274 (S.D.N.Y.1997). The plaintiffs argue that the defendants' bad faith is evidenced by the fact that they made copies of the plaintiffs' marks. I find, however, that, under the facts of this case, such copying is not, in and of itself, necessarily evidence of bad faith. Accordingly, the motions for summary judgment with respect to the plaintiffs' claim of unfair competition would be denied even if there existed no genuine issues of material fact with respect to the defenses of laches and acquiescence. At trial, the parties may submit evidence regarding the claim of unfair competition only to the extent that it relates to whether the defendants' actions constituted bad faith.

### D. *The Plaintiffs' Requests for Relief*

The plaintiffs seek both injunctive relief and an award of damages in the amount of three times defendants' profits, the plaintiffs' attorney fees and investigator costs, and prejudgment interest.

### 1. *Injunctive Relief*

The plaintiffs have asked this Court to enter a permanent injunction against the defendants restraining them from further engaging in the reboxing operation. Because the plaintiffs will succeed in their claim that the defendants' reboxing operation violated the Lanham Act only if they are able to defeat the defendants' affirmative defenses, injunctive relief in their favor is not appropriate at this stage. The request for a permanent injunction is therefore denied.

### 2. *Monetary Relief*

#### a. *Damages*

■ Although the defendants' assertion of the defenses of acquiescence and laches prevents my granting of summary judgment,[9] it is, nevertheless, possible to grant partial summary judgment regarding the amount of damages to which the plaintiffs will be entitled should they prevail in their claim of trademark infringement. *See* Fed. R.Civ.P. 56(d). Pursuant to 15 U.S.C. § 1117(a), the plaintiffs would be entitled to recover "(1) defendant['s] profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." Moreover, "[i]n assessing profits the plaintiff[s are] required to prove defendant[s'] sales only; defendant[s] must prove all elements of cost or deduction claimed." *Id.*

The plaintiffs have submitted evidence, in the form of an affidavit, that the defendants' revenues from selling the reboxed sweeteners were $3,794,723.00. *See* Kessler Aff. at ¶ 29. The defendants have countered by offering evidence, also in the form of an affidavit, that their revenues totaled only $3,684,622.75. *See* E. Baum Aff. at ¶ 9. Thus, the parties' calculations of revenues differ by $110,100.25.[10] Because genuine issues of material fact regarding the amount of defendants' revenue remain, summary judgment as to that amount is, at this point, inappropriate. Given, however, that the parties agree that the defendants' revenues are no more than $3,794,723.00 and no less than $3,684,622.75, at trial, I will hear evidence regarding the defendants' revenues only to the extent that such evidence serves to determine where, between those amounts, the defendants' revenues fall.

The defendants have submitted evidence, in the form of an affidavit, showing that their

---

9. In addition, in order to recover monetary damages under the Lanham Act, the plaintiffs "'must introduce evidence of actual consumer confusion' unless [they] can 'adequately demonstrate that a defendant has intentionally set out to deceive the public' through product infringement." *Jaret International, Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 72 (E.D.N.Y.1993) (quoting *Resource Dev. v. Statue of Liberty–Ellis Island*, 926 F.2d 134, 139–40 (2d Cir.1991)); *see also International Star Class Yacht Racing Association v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir.1996) ("Proof of actual confusion is ordinarily required for recovery of damages for pecuniary loss sustained by the plaintiff.").

10. The defendants account for some of this difference by arguing that the plaintiffs counted one wire figure in the amount of $78,500 .00 twice. *See* E. Baum Aff. at ¶ 9. The plaintiffs, of course, deny this allegation. *See* Plaintiffs' Reply Mem. at 10.

costs and deductions total $3,495,447.64. *See id.* The plaintiffs have countered that allegation by arguing that, because the defendants "have not provided a single shred of documentary evidence proving their costs or deductions," they have failed to prove their costs and deductions. *See* Plaintiffs' Reply Mem. at 11. Statements in an affidavit do constitute evidence. However, because, due to the expedited schedule of this case, the parties have yet to conduct discovery with respect to that issue, I decline to grant summary judgment with respect to the defendants' costs or deductions.

### b. *Treble Damages and Attorneys Fees*

■ The plaintiffs request an award of treble damages and attorneys fees under 15 U.S.C. § 1117(b), as well as an award of punitive damages under their claim of common law unfair competition.

Section 1117(b) of Title 15 of the United States Code provides as follows:

> In assessing damages under subsection (a) ... the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title or section 380 of Title 36 that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services.

At this stage in the action, I decline to address the question of § 1117(b)'s applicability to the plaintiffs' request for attorneys fees and treble damages.

■ "Under New York law, a plaintiff in an unfair competition case can recover punitive damages if the 'defendant's conduct has constituted "gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree." ' " *New York Racing Ass'n,* 920 F.Supp. at 304 (citations omitted).

At this stage in the proceeding, it is not yet clear whether the defendants' actions constituted "gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree." Accordingly, the determination of the plaintiffs' entitlement to punitive damages under their claim of unfair competition, as well as their entitlement to treble damages and attorneys fees under 15 U.S.C. § 1117(b), must await trial.[11]

### II. *The Plaintiffs' Motion for an Order Adjudging Defendants in Contempt*

■ The plaintiffs have asked this Court to find Cheski and Haskel in contempt on the ground that those defendants violated a Temporary Restraining Order entered by this Court on January 13, 1997. According to the plaintiffs, during a search and seizure they conducted at the Haskel defendants' premises on January 29, 1997, the plaintiffs discovered evidence that the Haskel defendants continued (1) to receive and possess the Equal product and (2) to repackage Equal in transparent plastic containers. *See* Kessler Aff. at ¶¶ 18–19.

■ "A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply." *New York State National Organization for Women v. Terry,* 886 F.2d 1339, 1351 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). The clarity of the order must be such that it enables the enjoined party "to ascertain from the four comers of the order precisely what acts are forbidden." *Drywall Tapers & Pointers of Greater New York, Local 1974 v. Local 530 of Operative Plasterers & Cement Masons International Association,* 889 F.2d 389, 395 (2d Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990).

The plaintiffs seek an order of contempt because, according to the plaintiffs, the January 13 Order required the defendants to

---

11. Because I have declined to grant summary judgment, the plaintiffs' request that they be relieved from their preliminary injunction bond and that they be allowed to destroy the seized product and the "counterfeiting implements" are denied.

cease "dealing with the Equal product in *any* manner." Contrary to what the plaintiffs state, however, this Court's January 13 Order did *not* order the defendants to cease "dealing with the Equal product in *any* manner." Rather, the January 13 Order required the defendants to cease dealing with goods bearing "a copy or colorable imitation of the Equal and/or NutraSweet trademarks."[12] Consequently, the defendants did not violate the Temporary Retraining Order by continuing to deal with the Equal product. In addition, I find that the Temporary Restraining Order did not clearly and unambiguously enjoin the repackaging of Equal in transparent plastic containers. The defendants' request for an order adjudging the defendants in contempt is denied.

### III. *The Defendants' Motion for Leave to File an Amended Answer*

The defendants seek leave to file an amended answer to correct errors as well as to add counterclaims for unfair competition and trade disparagement, libel, abuse of process, and cancellation of plaintiffs' trademark registrations on the ground of abandonment. Because the plaintiffs have not opposed the defendants' motion for leave to file an amended answer, that motion is granted.[13]

 The defendants also appear to move for summary judgment in their favor on their counterclaim of abandonment. The plaintiffs have opposed the defendants' motion.

The Lanham Act defines an abandoned trademark as a trademark whose "use has been discontinued with intent not to resume such use" or which has "become the generic name for the goods or services on or in connection with which it is used or otherwise ... [has lost] its significance as a mark" because of "any course of conduct of the owner." 15 U.S.C. § 1127.

The defendants have set forth no facts which would suggest that, through the actions of the plaintiffs, the Equal and Nutra-Sweet trademarks have lost their significance as trademarks. Rather, they appear to argue that, by encouraging the defendants and other distributors to repackage the Equal product in plastic packages which contain externally visible paper inserts bearing the Equal and NutraSweet trademark, the plaintiffs have abandoned those marks.

As I already have held, the defendants have violated the Lanham Act by constructing and distributing counterfeit boxes and by failing to inform the public that the product they distributed was repackaged by someone other than the plaintiffs. The plastic containers, however, were not counterfeit. Moreover, the defendants, in repackaging the Equal product in the plastic containers, informed the public that the product had been repackaged. Accordingly, by allegedly encouraging the defendants and others to repackage the Equal product in plastic containers, the plaintiffs did not abandon the trademarks. The defendants' motion for summary judgment on the ground of abandonment is therefore denied.

### IV. *The Defendant's Motion to Modify the Preliminary Injunction and Seizure Orders*

On three different occasions beginning on January 13, 1997, I issued orders authorizing the plaintiffs' seizure of evidence of the de-

---

12. Specifically, the January 13 Order prohibited the Haskel defendants

> [f]rom possessing, receiving, manufacturing, assembling, distributing, advertising, promoting, returning, offering for sale or other wise disposing of in any manner, holding for sale or selling any goods, packaging, goods, wrappers, containers and recepticals, and any catalogues, price lists, promotional materials and the like bearing a copy or colorable imitation of the Equal and/or NutraSweet trademarks. . . .

13. With respect to the defendants' claim that the plaintiffs have abandoned their trademark, the plaintiffs have argued only that the defendants' attempt to add that claim should be denied as futile because the defendants' have not alleged any facts in furtherance of that claim which would prevent this Court from granting summary judgment in favor of the plaintiffs. With respect to the remaining counterclaims, the plaintiffs similarly argue that those claims do not prevent summary judgment in favor of the plaintiffs and, accordingly, that, in the event I grant summary judgment in favor of the plaintiffs, I should order severance of those counterclaims. Given that I have declined to grant summary judgment in favor of the plaintiffs, the grounds the plaintiffs advance in opposition to the request to amend the answer are irrelevant.

fendants' repackaging operations. In addition, on March 14, 1997, I entered a preliminary injunction enjoining the defendants from dealing with packaging bearing a copy or colorable imitation of the plaintiffs' trademarks. The defendants have moved for an order returning much of what was seized pursuant to the seizure orders. They further request that this Court amend the March 14 preliminary injunction.

### A. Modification of the Preliminary Injunction

█ To be entitled to a preliminary injunction, the plaintiffs must demonstrate " '(i) irreparable harm *and* (ii) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly' in [their] favor." *Warner–Lambert,* 86 F.3d at 6.[14] The defendants, however, can prevent the entering of a preliminary injunction by demonstrating that the plaintiffs delayed unreasonably before seeking the injunction. *See Del–Rain v. Pelonis USA Ltd.,* No. 94–CV–587S, 1995 WL 116043, at *6 (W.D.N.Y. Feb.28, 1995).

The defendants have submitted evidence tending to prove that, as early as January of 1996, employees of Hunt–Wesson, which is asserted to be an agent of NutraSweet, were aware of and acquiesced in the defendants' repackaging of the Equal product in transparent plastic containers. *See* C. Baum Aff. at ¶ 14. Such evidence tends to suggest that the defendants delayed unreasonably before seeking a preliminary injunction, a fact

which, if proven, may well entitle the defendants to relief from the preliminary injunction. Accordingly, a hearing will be conducted on this issue.

### B. The Seizure Orders

█ Pursuant to the seizure orders, the defendants seized the following "categories" of Equal product: (1) Equal product in the institutional size containers; (2) loose individual packets of Equal product; (3) individual packets that the defendants have repackaged into transparent plastic containers; and (4) Equal product purchased in the institutional size containers and repackaged into the retail-size boxes made by the defendants. The order also authorized the seizure of the defendants' business records and furniture, including tables, and production and office equipment.

The defendants do not violate the Lanham Act by purchasing, owning, or reselling the institutional boxes of Equal product.[15] Nor do the loose packets of Equal, in and of themselves, create a risk of confusion as to source. There remains, however, a genuine issue of act with respect to the question of whether the defendants' treatment of the loose packets of Equal undermines the plaintiffs' quality control procedures. Accordingly, I order the plaintiffs to return to the defendants (1) the institutional boxes of Equal; and (2) the defendants' business records and furniture.[16]

### CONCLUSION

For the reasons set forth above, the parties' motions for summary judgment and the

---

14. The plaintiffs maintain that, because the defendants consented to my entry of the preliminary injunction, they may not now seek to have it modified. I disagree. *See King–Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31, 35 (2d Cir.1969) ("While changes in fact or in law afford the clearest bases for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes...."); *see also Miller v.. SEC,* 998 F.2d 62, 64 (2d Cir.), *cert. denied,* 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993).

15. The plaintiffs argue that they should not be required to return the institutional size boxes

because, upon inspecting those boxes, they discovered that the defendants had removed the boxes' expiration dates. Although the defendants do not deny that the expiration dates were removed, such removal is not the subject of this suit. Accordingly, I have not considered that fact in determining whether the defendants are entitled to the return of the institutional boxes.

16. With respect to the disposition of the loose packets of Equal which the defendants had repackaged in the transparent plastic containers and the loose packets which the defendants had repackaged in the counterfeit boxes, the parties, in entering into the Revised Preliminary Injunction, reached an agreement. *See supra* note 1.

plaintiffs' motion for an order holding defendants in contempt are denied. The defendants' motion for leave to file an amended answer is granted. The defendants' motion for an order returning the seized property is granted to the extent set forth in the preceding paragraph.

So Ordered.