In re WORLD PARTS, LLC, Debtor.

No. 01–10839 B.

United States Bankruptcy Court,
W.D. New York.

March 27, 2003.

Damon & Morey LLP, William F. Savino, Esq., of counsel, Buffalo, NY, for Innovative Transmission & Engine Company, LLC, and D.R. Watson Holdings, LLC.

John P. Bartolomei, Esq., Niagara Falls, NY, for Gregory Samer & Richard S. Massaro, Jr.

CARL L. BUCKI, Bankruptcy Judge.

Two creditors have moved to hold certain officers and counsel of the debtor in contempt. Specifically, the motion seeks sanctions under Bankruptcy Rule 9011 for the presentment of inaccurate financial statements, and under Bankruptcy Rule 9020 for the violation of a prior order of this court. Upon determining the occurrence and scope of contempt, the court must further consider the limits of an appropriate penalty.

World Parts, LLC, the debtor herein, had as its primary business the purchase and sale of used automotive and truck parts. Consequently, the debtor possessed significant inventory when it filed a petition for relief under chapter 11 of the Bankruptcy Code on February 14, 2001. Throughout the pendency of the proceedings in chapter 11, the debtor claimed ownership of all of this inventory, subject to a perfected security interest of Creek Ventures, LLC ("Creek Ventures"). The present dispute derives from competing claims to portions of that inventory by Innovative Transmission and Engine Company, LLC ("ITEC") and D.R. Watson Holdings, LLC ("Watson"). ITEC, Watson, and Creek Ventures are all owned or controlled by Frank E. Peters or his spouse, and the same counsel has represented all three entities throughout these proceedings.

The present dispute had its genesis in a secured creditor's sale of assets that were previously owned by World Auto Parts, Inc. ("World Auto Parts"). Also controlled by Frank Peters or his spouse, World Auto Parts shared warehouse space with ITEC and utilized the services of some of the same employees. Among these were two of the respondents to the present motion, namely Richard S. Massaro, Jr., and Gregory T. Samer. Sometime prior to November of 2000, World Auto Parts defaulted on obligations to its secured creditor. Massaro and Samer then became officers of a new entity formed to acquire the inventory of World Auto Parts through a secured creditor's sale. That new entity was the debtor, World Parts, LLC. Creek Ventures provided financing for the debtor's acquisition of inventory, through a demand note secured by the assets of World Parts. Initially, ITEC and World Parts continued business at the prior location of World Auto Parts, with operations that essentially mimicked the previous activity. The relationship between Peters and the officers of World Parts deteriorated rapidly, however. Less than four months after the debtor's start of business, Creek Ventures called its demand note. In response, World Parts filed the present petition for bankruptcy relief.

Upon filing its bankruptcy petition, the debtor neglected either to negotiate arrangements for the use of cash collateral or to move immediately for such authority. Instead, by order to show cause dated February 18, 2001, Creek Ventures sought sanctions for the unauthorized use of cash collateral and to restrict the debtor's expenditure of funds. In response, the debtor cross moved for use of cash collateral. Meanwhile, ITEC asserted title to part of the inventory that was in the debtor's possession, while Watson claimed a security interest in the assets of ITEC. During the course of argument relative to the use of cash collateral, ITEC and Watson contended that the debtor had no authority to sell ITEC's assets, and that aside from any obligation to provide adequate protection to Creek Ventures, the debtor should return all of ITEC's remaining inventory, together with proceeds derived from any

sales of such inventory. In response, the debtor asserted that it had acquired ITEC's inventory as consideration for its assumption of ITEC liabilities, at approximately the same time as the secured creditor's sale.

On several occasions during February and March of 2001, this court orally approved the limited use of cash collateral. The debtor failed to present promptly an order memorializing that authorization, so that the court did not finally sign a cash collateral order until April 30. Included in that order was language designed to preserve the claims of ownership in the disputed assets. Specifically, the court ordered that:

> (3) the Debtor is to physically segregate the inventory attributable to or derived from Innovative Transmission and Equipment Company, LLC ("ITEC" and the "ITEC Inventory", respectively) and segregate the proceeds of its accounts receivable and other proceeds on or from disposition of the ITEC Inventory (the "ITEC Receivable"); (4) the Debtor is to forego sale of the ITEC Inventory, effective March 9, 2001, pending further order of the Court; and (5) the Debtor is to segregate in a separate account all cash or other proceeds of any ITEC Inventory or ITEC Receivable and hold same segregated in said account without withdrawal therefrom pending further order of this Court (the "ITEC Account"); (6) the Debtor and/or ITEC are accorded leave to commence an adversary proceeding as appropriate to establish ownership of the ITEC Inventory, ITEC Receivable and ITEC Account.

Initially, the debtor complied at least in part with the requirements of this order. It segregated the disputed inventory and deposited $5,875 into a certificate of deposit that was designated for proceeds from prior sales of ITEC inventory. Eventually, however, the debtor began to sell certain of the segregated inventory and in September of 2001, it transferred the balance in the certificate of deposit into the debtor's operating account. Meanwhile, as suggested by part 6 of the April 30th order, Watson commenced an adversary proceeding to determine the ownership of disputed assets. A trial of this dispute was set for September 27, 2001, but was canceled when the debtor consented on that date to a voluntary conversion of this case to chapter 7.

From its inception, this case presented many contentious issues. Rather than effecting their abatement, the case's conversion has shifted the outstanding antagonisms into the forum of a contempt proceeding. On November 21, 2001, ITEC and Watson filed the present motion to hold Richard S. Massaro, Jr., Gregory T. Samer, and John P. Bartolomei in civil contempt under Bankruptcy Rules 9011 and 9020. Massaro and Samer had served as officers of the debtor throughout the pendency of the proceeding in Chapter 11. Bartolomei was counsel to the chapter 11 debtor. In asserting a violation of Rule 9011, ITEC and Watson allege that the debtor's monthly financial statements grossly exaggerated the debtor's receivables and also misrepresented that the debtor had complied with the requirement for asset segregation. ITEC and Watson contend that if they only had known the true state of affairs, they might have been able to move successfully for an earlier conversion of the case, prior to the disposition of ITEC assets. Secondly, the movants seek a finding of contempt under Rule 9020, by reason of an alleged failure to segregate the ITEC assets, as required by the cash collateral order of April 30, 2001.

### Rule 9011 Sanctions

Bankruptcy Rule 9011 generally imposes upon counsel an obligation to assure the truthfulness and accuracy of pleadings and papers. Subdivision (a) of this rule states that at least one attorney of record must sign "[e]very petition, pleading, written motion, and other paper, except a list, schedule, or statement, or amendment thereto." The standard of accuracy for these papers is then set by subdivision (b), which provides in relevant part as follows:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, .... (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

In the present instance, the debtor prepared monthly financial reports. ITEC and Watson argue that by reason of the filing of these reports, the respondents certified that the contents had evidentiary support. Noting various inaccuracies in them, ITEC and Watson now ask this court to impose sanctions under subdivision (c) of Rule 9011. This request must be denied for two reasons: first, Rule 9011 has no application to the monthly financial reports of World Parts; and second, even if the rule were applicable, ITEC and Watson failed to satisfy the procedural requirements of subdivision (c).

The submission of financial reports is a duty not of counsel, but of the debtor in possession. Section 1107 of the Bankruptcy Code imposes upon a debtor in possession most of the duties of an independent trustee in chapter 11. As defined by section 1106, these duties include the obligations of a case trustee under section 704(8). Accordingly, the debtor in possession must file periodic reports and summaries of business operations, "including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires." 11 U.S.C. § 704(8). Here, World Parts LLC filed monthly financial statements in the format required under the guidelines of the United States Trustee. These guidelines do not contemplate the signature of counsel, and Mr. Bartolomei did not sign any of the reports.

■ Essential to the argument of ITEC and Watson is the contention that the respondents certified the contents of the monthly financial reports, by operation of Bankruptcy Rule 9011(b). Pursuant to this subdivision, an attorney or unrepresented party certifies the allegations and other factual contentions of a paper, "by presenting" that paper to the court. Monthly financial reports are an obligation of the debtor, which was represented by an attorney at all times that are here relevant. Not being that attorney, neither Massaro nor Samer could have any liability under Rule 9011. As debtor's counsel, John C. Bartolomei is the only respondent with potential liability under the rule. The question is whether Mr. Bartolomei ever presented the financial reports to the court.

■ Bankruptcy Rule 9011(a) requires that except for parties who are not represented, an attorney of record must sign "[e]very petition, pleading, written motion, and other paper, except a list, schedule, or statement." In the view of this court, the exception for a "statement" would apply to a monthly financial report filed pursuant to the requirements of 11 U.S.C. § 704(8). Were it otherwise, the debtor's reports

would have been stricken due to the absence of an attorney's signature. *See* FED. R. BANKR. P. 9011(a). In any event, the monthly financial reports of World Parts were filed by the debtor, and not under signature of its counsel. Never having presented the financial reports to the court, Mr. Bartolomei made no certification about them.

■ While this court does not condone the submission of a false or misleading financial report, the remedy for misrepresentation lies elsewhere than in the sanctions of Bankruptcy Rule 9011(c). In special circumstances, such misrepresentation may provide grounds for the conversion of a case, or a reduction of fee allowances, or the appointment of an examiner or independent trustee. Here, World Parts ultimately converted this case before the court could decide an outstanding motion to appoint a trustee. Appropriately, the court should impose remedies only upon parties who are accountable for the wrongdoing. Without any implied certification from counsel, the financial reports provide no basis for sanctions against Mr. Bartolomei.

■ Even if the financial reports were sanctionable under Bankruptcy Rule 9011, ITEC and Watson failed properly to initiate a contempt proceeding. Subdivision (c) of Rule 9011 governs the imposition of sanctions for a violation of subdivision (b). Except when brought on the court's own initiative, a motion for such sanctions "shall be made separately from other motions or requests." FED. R. BANKR. P. 9011(c)(1)(A). Contrary to this directive, ITEC and Watson filed an omnibus motion seeking relief under both Bankruptcy Rule 9011 and Bankruptcy Rule 9020. Further, Rule 9011(c)(1)(A) states that "[t]he motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected . . . ." The obvious purpose of this "safe harbor" provision is to allow to counsel an opportunity to correct an alleged violation prior to the imposition of sanctions. *See* 10 COLLIER ON BANKRUPTCY ¶ 9011.06[1][b] (Alan N. Resnick *et al.* eds, 15th ed. rev.2002). In the present instance, ITEC and Watson filed their motion on November 21, 2001, and caused it to be served upon the respondents on that same date. By depriving the respondents of any opportunity to correct the financial reports, ITEC and Watson forfeit the right to seek sanctions under Bankruptcy Rule 9011.

### Rule 9020 Sanctions

■ ITEC and Watson purport to base the balance of their motion on Bankruptcy Rule 9020. In truth, this rule merely establishes procedural guidelines covering motions for an order of contempt. "Issues relating to the contempt power of bankruptcy judges are substantive and are left to statutory and judicial development." FED. R. BANKR. P. 9020 advisory committee note to 2001 amendments. Amendments to Rule 9020 were implemented on December 1, 2001, shortly before ITEC and Watson filed their motion but before the hearing on this matter. These changes, however, were of no consequence to the present dispute. Rather, the central issues involve the reach of contempt sanctions for a violation of an order of this court.

■ Bankruptcy courts possess the power to impose sanctions for acts of civil contempt. *In re Chateaugay Corp.,* 920 F.2d 183, 187 (2nd Cir.1990). The purpose of civil contempt is never punitive, but "to coerce compliance with a court order or to

compensate an injured party for losses suffered by reason of the contemptuous behavior." 10 COLLIER ON BANKRUPTCY ¶ 9020.01[1] (Alan N. Resnick *et al.* eds. 15th ed. rev.2002). *Accord, United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947), *Vuitton et Fils, S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir. 1979), *Matter of Kalpana Electronics, Inc.,* 58 B.R. 326, 333 (Bankr.E.D.N.Y.1986). In the instant case, ITEC and Watson contend that the debtor violated the court's order that required a segregation of the ITEC assets, and that for this violation, the court should impose sanctions upon the respondents. Seeking compensation for losses incurred, the movants ask that sanctions include the value of assets that should have been segregated, together with reimbursement for the costs of litigating this motion.

Altogether, the court heard seven days of testimony on the present motion. Unmistakably, the proof established violations of the court's order of April 30, 2001. Although the debtor initially segregated the ITEC inventory and proceeds, it failed to maintain that segregation. Contrary to the fourth ordering paragraph, the debtor sold various items of ITEC inventory without approval from this court. World Parts closed the mandated account that segregated the proceeds of ITEC inventory, and deposited those funds into the general operating account to pay business expenses. Based upon all of the evidence, the court would certainly have found the debtor to be in contempt of the order of April 30. The debtor, however, is not a respondent to the present motion. Rather, the motion poses two more difficult questions. First, may the court find contempt in the conduct of parties other than the entity upon which the court had imposed the obligations of the April 30th order? Second, what standards should apply to a determination of sanctions?

■ American Jurisprudence 2nd states well the standard for contempt by a non-party:

> In order for a person who is not a party in an action in which a court order was issued and who is not named in the order to be held in contempt of court for acting in violation of the order, the nonparty must be in privity with, must aid and abet, or must act in concert with, the named party in acts constituting a violation of the order, must conspire to cause or bring about a contemptuous action, or must act in collusion or combination with the named defendants.

17 AM. JUR. 2D *Contempt* § 62 (1990). Essentially, for nonparties, a finding of civil contempt requires three elements of proof: that the respondents have a relationship of privity with the named party, that they have knowledge of the court's prior order, and that they act affirmatively to cause or facilitate a violation of that order. Notably, these three requirements are common to numerous reported cases of civil contempt by a non-party. *See, e.g., Gemco Latinoamerica, Inc., v. Seiko Time Corp.,* 61 F.3d 94, 99–100 (1st Cir.1995); *In re Snider Farms, Inc.,* 125 B.R. 993, 996 (Bankr.N.D.Ind.1991).

■ In the present instance, Richard S. Massaro, Jr., and Gregory T. Samer were responsible for the debtor's violation of the order of April 30, 2001. Both were officers of the debtor; both were present when the court announced that it would order a segregation of the ITEC assets; both held managerial authority; and both participated in the making and implementation of decisions to use the ITEC assets that the debtor was obliged to segregate. As officers of World Parts, Massaro and Samer held a relationship of privity with the debtor. They had knowledge of the

court's order and caused the debtor to violate its terms. For these reasons, they are to be held in contempt of the April 30th order. This result follows the reasoning of the Supreme Court in *Wilson v. United States,* 221 U.S. 361, 376, 31 S.Ct. 538, 55 L.Ed. 771 (1911): "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt."

 Early in these proceedings, the court dismissed the motion for contempt as against John P. Bartolomei. As counsel for the debtor, Mr. Bartolomei would have had knowledge of the April 30th order. He was not, however, an officer of the corporation. Having no management authority, he lacked the necessary privity with respect to decisions of World Parts. Even if the debtor based its conduct upon the advise of counsel, Bartolomei did not control the debtor's actions, and accordingly did not cause or facilitate the debtor's contempt. Like other professionals, attorneys must suffer the consequences of their mistakes. For example, improper counsel may create issues with respect to allowance of compensation. Bad legal advise, however, is not an act of contempt.

 Having made a finding of contempt with respect to Massaro and Samer, this court must next determine an appropriate sanction. As distinguished from criminal contempt, civil contempt "is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497,

93 L.Ed. 599 (1949). Upon the conversion of this case to chapter 7, the case trustee assumed control of the debtor's activities. As a consequence, the movants have no need for further compliance by Massaro and Samer. Rather, the sole remaining purpose of sanctions is to compensate ITEC and Watson for any losses or damages caused by the violation of the order of April 30, 2001.

ITEC and Watson calculate that the debtor failed to maintain the segregation of assets having a value of $31,375. The movants claim that their damages include this amount, together with legal expenses incurred in the prosecution of the present motion. Massaro and Samer respond that the proceeds of any ITEC assets were deposited into the general operating account of the debtor. As such, the proceeds merely enhanced the net worth of the debtor, which is itself liable to ITEC and Watson for their entire claim. Because ITEC and Watson may now assert claims against the debtor, Massaro and Samer argue that the movants have incurred no damage as a consequence of any failure to segregate assets.

Both sides assert legal positions that are incorrect. The valuation of unsegregated assets provides a quantification of the basis for liability; it does not necessarily establish the ultimate damages that ITEC and Watson will have incurred. The order of April 30, 2001, contemplated a distribution of segregated assets only after a determination of ownership. As of the conclusion of the evidentiary hearing on the contempt motion, the adversary proceeding to determine ownership had not yet been resolved. Even if we were to assume that the segregated assets belonged to ITEC or Watson, an accurate valuation of those assets will not necessarily define the ultimate damages. Distributions from the debtor's estate may offset these losses, and

can thereby render inaccurate the damage calculation that the movants have proposed. Similarly, Massaro and Samer are premature in their conclusion that the movants have incurred no damages. The deposit of proceeds into the debtor's accounts is an event with no sure consequence for liability. Such placement of proceeds will not necessarily produce a fund for payment to ITEC and Watson. For example, the debtor in possession might have spent these moneys for other purposes, or the chapter 7 trustee might need the fund to satisfy his own expenses of administration. Rather, the proper standard of damage is the loss that ITEC and Watson will ultimately suffer by reason of the failure to segregate assets.

This court acknowledges the movants' calculation, that but for the failure to segregate assets, the debtor would now hold the sum of $31,375 in escrow. This fact does not show that ITEC and Watson would necessarily have received this money. Indeed, the reason for segregation was to preserve the ITEC assets for the benefit of all competing claimants. On the other hand, the failure to segregate assets does not necessarily preclude the possibility of payment, in whole or in part, of an administrative claim for the value of assets that the debtor should have segregated. While this court finds Massaro and Samer to be in contempt of its order requiring asset segregation, the question of damages was not yet ripe for decision as of the conclusion of the evidentiary hearing on the present motion. When it began to write this opinion, the court expected to defer the determination of damages to a future time. Subsequent proceedings indicate, however, that that time has now arrived.

By order dated January 10, 2003, this court approved a stipulation of settlement among the trustee, ITEC, Watson, and Creek Ventures. Among other purposes, this stipulation resolved "to settle without further litigation the Debtor's conversion of the ITEC Assets." Specifically, the settlement allows ITEC and Watson to prosecute litigation, on the trustee's behalf, to avoid the various transfers of ITEC assets. ITEC and Watson assume the expenses of this litigation, and are to receive 90% of any recovery. Of greatest relevance to the present dispute is paragraph 2(a) of the stipulation, which states that "[t]he Debtor's defenses to the claims of ITEC are compromised, released and discharged based on the Debtor's retention and receipt of 10% of the Debtor's recovery on any and all avoidance of the Debtor's various transfers of the ITEC Assets." With respect to contempt, the issue is whether this settlement serves also to limit the liabilities of Massaro and Samer.

The parties can claim no surprise from a present consideration of the impact of the debtor's settlement with ITEC and Watson. The notice of motion to approve that settlement was duly served upon John P. Bartolomei, the attorney for Massaro and Samer, and upon William F. Savino, the attorney for ITEC and Watson. Although Bartolomei chose not to attend the hearing, he received a full opportunity to urge a broad waiver of rights as against his clients. Moreover, ITEC and Watson were the parties who would suffer adversely from any consequential limitation of liability. Most critically, Savino did appear on their behalf. At the hearing, the court questioned the effect of the settlement on the determination of contempt damages. Mr. Savino insisted that the settlement should not affect his clients' claims, but asked that the court approve the stipulation despite any such impact.

The contempt of Massaro and Samer derives from a failure to segregate assets *by the debtor*. Accordingly, the damage

from that contempt is the loss that ITEC and Watson incurred due to the absence of such segregation. Pursuant to their settlement with the trustee, however, ITEC and Watson will receive consideration for their interest in the assets that the debtor should have segregated. Thereby obtaining payment for the value of their claim, ITEC and Watson have incurred no other actual damages.

The purpose for segregation was not to guarantee a turnover of assets to ITEC and Watson, but the preservation of those assets until such time as this court might determine their rightful ownership as between the debtor and ITEC and Watson. By their voluntary settlement with the trustee, ITEC and Watson have accomplished this objective. At the hearing to approve the settlement, Savino argued that the liability of Massaro and Samer was joint and several with the liability of the debtor, and that the respondents should remain fully accountable for the value of the ITEC assets. This argument might have had some colorable basis, if the order of April 30, 2001, had directed the segregation of assets to which ITEC and Watson held an undisputed claim of ownership. Instead, the order mandated the segregation of disputed assets. With that dispute now having been resolved, neither the debtor's estate nor the respondents have any further obligation to account for the missing assets. Furthermore, it is no longer possible for this court to determine actual damages. Any such determination would have required an initial assessment of the interest of the debtor in the ITEC assets. In light of the settlement, this issue is never to be decided by the court. Because Massaro and Samer are not parties to the settlement, the court will not allow the settlement to prejudice their rights, most notably with respect to the valuation of the debtor's interest in the ITEC assets.

The concept of joint and several liability has no meaning in the present context. Even among joint and several obligors, individual exposure will not exceed the outstanding amount of unsatisfied loss. By reason of the stipulation of settlement, the debtor has resolved any further claim for damages for misappropriation of ITEC's assets. Thus, ITEC and Watson have no remaining actual damages for which Massaro and Samer would now have liability.

Despite the absence of any actual damages, the respondents may not commit contempt with impunity. Massaro and Samer remain liable for consequential damages, which in the present instance include the reasonable legal expenses of ITEC and Watson. The movants assert that in connection with their motion for contempt, they have incurred legal fees totaling $24,824, together with costs of $1,437.03. In the view of this court, however, an award of legal expenses in these amounts would be excessive. The legal expenses relate not only to that portion of the motion which successfully sought a finding of contempt under Bankruptcy Rule 9020, but also in part to the unfounded request for a holding of contempt under Bankruptcy Rule 9011. Nor does contempt provide an unrestricted opportunity to recover all of the legal expenses that an aggrieved party may have incurred. Rather, the proper measure of such consequential damage is the expense that a party should have incurred in a diligent presentment of its rights.

The trial of the contempt motion was excessively tedious and unduly protracted. Essentially, the strategy of counsel was to present painstaking proof about each missing asset and about the events which caused it not to be segregated. In truth, the court had need to decide a more simple

issue, namely whether the ITEC assets were still segregated on the date of conversion. In no more than a few hours of testimony, a competent forensic accountant should have been able to identify the missing assets and to calculate their value. Instead, the testimony extended over seven days, despite the imposition of time limits and the court's repeated request for brevity. If only the movants' counsel had spared the court from having to learn irrelevant details, he could have proven their case in a fraction of the time expended. Legal fees, therefore, will be allowed only for the value of time needed to establish the necessary elements of proof. In the view of this court, the fair value of this time and related disbursements would not exceed $6,000.

By reason of the foregoing, this court will hold Massaro and Samer in contempt of the order of April 30, 2001. Due to their recent settlement with the trustee, however, ITEC and Watson have suffered only consequential damages. These will be limited to legal expenses in the amount of $6,000. Accordingly, judgment in this amount will be awarded jointly to the movants as against the respondents.

So ordered.