**In re CHIEF EXECUTIVE OFFICERS CLUBS, INC., Debtor.**

No. 02–14829–MG.

United States Bankruptcy Court, S.D. New York.

Jan. 31, 2007.

530

---

Avrum J. Rosen, Esq., The Law Offices of Avrum J. Rosen, of Counsel, Huntington, NY, Attorneys for Trustee.

Michael Siegel, Esq., Siegel & Siegel P.C., of Counsel, New York, NY, Attorneys for Joseph Mancuso.

***MEMORANDUM OPINION AND ORDER REGARDING TRUSTEE'S MOTION SEEKING TO HOLD JOSEPH MANCUSO IN CIVIL CONTEMPT***

MARTIN GLENN, Bankruptcy Judge.

Kenneth P. Silverman, the Chapter 7 Trustee ("Silverman" or the "Trustee") of

Chief Executive Officers Clubs, Inc. ("Debtor"), seeks an order holding Joseph Mancuso ("Mancuso") in civil contempt for violating a November 18, 2002 Order ("November 18 Order") signed by Chief Judge Bernstein. The November 18 Order enjoined Mancuso from transferring or diverting any property of Debtor's estate pending the appointment and qualification of a chapter 11 trustee. The Trustee alleges that Mancuso violated the November 18 Order by transferring money from Debtor's bank account for his own use or benefit.

Federal Rule of Civil Procedure 52 (Findings by the Court) is applicable to this contested matter. *See* Federal Rules of Bankruptcy Procedure 7052, 9014(c) and 9020. This Memorandum Opinion and Order includes the Court's findings of fact and conclusions of law. The Court has also included specific findings with respect to the credibility of the witnesses who testified in Court based upon my opportunity to hear and observe the witnesses as they testified.

For the reasons provided below, the Court grants the Trustee's motion in part and denies it in part, ordering that Mancuso pay the Trustee the sum of $1,500 on or before 5:00 p.m., Monday, February 12, 2007. If Mancuso fails to pay the money to the Trustee by that date and time, Mancuso and his counsel shall appear before the Court on February 13, 2007, at 10:00 a.m., in Courtroom 723, to show cause why Mancuso should not immediately be jailed until he pays the money.

## I. Background

The Debtor filed a chapter 11 case on September 30, 2002. The Debtor is a not-for-profit New York corporation. Mancuso was its Chief Executive Officer, and he signed the chapter 11 petition. Gabriel Del Virginia, Esq. appeared as the Debt-or's counsel of record when the case was filed. The chapter 11 petition did not include the required schedules and statement of affairs. At the request of 180 Varick Street Corporation ("180 Varick Street"), Debtor's largest creditor, the Debtor was directed to file full schedules and a statement of affairs on or before November 8, 2002, by 5:00 p.m. (ECF Docket No. 8). The Debtor never filed the documents. On October 27, 2002, 180 Varick Street filed an application for an order to show cause for the appointment of a chapter 11 trustee. The order to show cause was entered on October 31, 2002, and a hearing was scheduled for 10:00 a.m., November 18, 2002 (ECF Docket No. 13). The events at issue in this contempt proceeding happened after Mancuso learned that the order to show cause for the appointment of a chapter 11 trustee had been entered, and that appointment of a trustee would strip him of the power unilaterally to transfer the Debtor's property.

At the November 18, 2002 hearing, Chief Judge Bernstein granted the motion for appointment of a trustee. Because of concerns raised regarding Mancuso's conduct as Chief Executive Officer of the debtor in possession, Chief Judge Bernstein enjoined Mancuso and his wife from transferring or diverting property of the estate pending appointment and qualification of the trustee. With Mancuso present in the courtroom, Chief Judge Bernstein announced his decision from the bench. The written November 18 Order was signed by Chief Judge Bernstein at 11:07 a.m. and entered on the docket at 11:30 a.m. (ECF Docket No. 21). The November 18 Order provided as follows:

> ORDERED, that pending the appointment and qualification of the chapter 11 trustee, the management of the debtor, including Joseph Mancuso and Karla

Mancuso, are enjoined without further order of the Court from transferring or diverting any property of the estate except for the payment of the wages (and corresponding payroll taxes) of three employees as specifically authorized on the November 18, 2002 record.

The carve-out permitting payment of wages and payroll taxes of three employees was included after Mancuso raised the issue during the November 18, 2002 hearing.

On November 26, 2002, Silverman was appointed as the chapter 11 trustee. On March 11, 2003, the case was converted to a case under chapter 7, and on March 24, 2003, Silverman was appointed as the chapter 7 trustee.

After his appointment, the Trustee commenced an investigation into the conduct of the Debtor's business and affairs. The Trustee's counsel served subpoenas for bank records, including a subpoena on The Provident Bank ("Provident"), where the Debtor maintained a business checking account in the name CEO Clubs, Inc. Based upon a review of Debtor's "Reconciliation Detail" for the Provident account, *see* PX 15, and the Provident bank records, *see* PX 12, the Trustee believed that Mancuso transferred or diverted money from the Debtor's Provident account after the November 18 Order was entered.

On March 25, 2004, the Trustee applied for and the Court signed an order to show cause why Mancuso should not be held in civil contempt for violating the November

18 Order (ECF Docket Nos. 80 and 81). Specifically, Silverman alleges that, in violation of the November 18 Order, Mancuso made, or caused to be made, the following transfers of estate property: (1) a $31,-375 [1] wire transfer on November 18, 2002, from the Debtor's Provident account to CEO Clubs China, Inc.; (2) a $5,000 check, dated November 15, 2002, signed by Mancuso and made payable to cash, that was endorsed and cashed by Mancuso on November 18, 2002; (3) a $20,000 check, dated November 8, 2002, signed by Mancuso and made payable to his minor daughter, with the legend "repay loan" handwritten on the check; (4) a $1,500 check, hand-dated November 16, 2002, but allegedly back-dated from November 19, 2002, signed by Mancuso and made payable to Wells Fargo Bank; and (5) two payroll checks for salary to Mancuso and his wife, both dated November 26, 2002, in the amounts of $436.09 and $419.90, respectively.[2]

An evidentiary hearing on the contempt motion was scheduled for March 31, 2004. The disposition of the motion was long-delayed, however, by various requested adjournments, and by a personal chapter 7 case Mancuso filed on April 9, 2004, in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (*see* ECF Docket No. 90). Following briefing on the impact of Mancuso's pending chapter 7 proceeding on the continued prosecution of the civil contempt motion, on July 20, 2004, Chief Judge Bernstein concluded in a written opinion that contin-

---

**1.** The actual amount withdrawn from the Provident account on November 18, 2002 was $31,410, including a $35 wire-transfer fee.

**2.** With respect to the two payroll checks, the Trustee raised these checks for the first time in the contempt hearing on January 17, 2007. The payroll checks were not raised in the Order to Show Cause (ECF Docket No. 80), the Affirmation in Support of the Order to

Show Cause (ECF Docket No. 81), the Trustee's Supplemental Affirmation (ECF Docket No. 99), or the proposed Pre–Trial Order filed on January 10, 2007 (ECF Docket No. 108). Therefore, the Court concludes that these transfers are not properly before the Court in this proceeding. *See also* Section IV.E, *infra*, at 22.

uation of the contempt proceeding was barred by the automatic stay, 11 U.S.C. § 362(a), because the relief sought was purely compensatory (ECF Docket No. 94).

In January 2005, Silverman commenced an adversary proceeding against Mancuso in his Texas chapter 7 case seeking to deny Mancuso a discharge. A trial of the adversary proceeding was held in January 2006. On August 16, 2005, a Judgment was entered denying Mancuso a discharge pursuant to 11 U.S.C. § 727(a)(3), (a)(4)(A) and (a)(5) (see ECF Docket No. 99, Exhibit A). Judge Brenda T. Rhoades also filed detailed Findings of Fact and Conclusions of Law ("Findings & Conclusions"), concluding that Mancuso engaged in numerous acts of misconduct that barred any discharge.[3] Id.

With Mancuso's discharge denied, on September 29, 2006, the Trustee requested that the contempt proceeding be placed back on the Court's calendar (ECF Docket No. 98). On November 3, 2006, the Trustee filed supplemental papers in support of the contempt motion (ECF Docket No. 99).

All matters relating to the motion to hold Mancuso in civil contempt were transferred to the undersigned, and on December 20, 2006, the Court conducted a pretrial scheduling conference. A Scheduling Order was entered the next day, requiring the parties to complete a joint pretrial order identifying witnesses and documents that the parties anticipated relying upon during the evidentiary hearing, and scheduling the evidentiary hearing for January 17, 2007 (ECF Docket No. 106).

## II. A Court's Power to Impose Civil Contempt Sanctions

### A. Court's Authority to Punish for Contempt

Courts have inherent power to enforce compliance with their lawful orders through civil contempt. See Spallone v. United States, 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990); Shillitani v. United States, 384 U.S. 364, 369, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). As the Supreme Court stated in Ex parte Robinson, 19 Wall. 505, 86 U.S. 505, 510, 22 L.Ed. 205 (1874), "the power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts and, consequently, to the due administration of justice." See also 11A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2960 (3d ed. 2006) ("A court's ability to punish contempt is thought to be an inherent and integral element of its power and has deep historical roots.").

Courts have embraced the inherent contempt authority as a power "necessary to the exercise of all others." Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ("Courts independently

---

**3.** Judge Rhoades concluded that Mancuso "admitted that he destroyed and failed to preserve his personal financial information during the years preceding his personal bankruptcy case," Findings & Conclusions ¶ 55; "the Debtor testified falsely to this Court" about maintaining records relating to his business dealings with the CEO Club Chapters, id. at ¶ 70, he knew the statements were false when he made them, id. at ¶ 71, and

"[h]e made each of the false statements with the intent of concealing his business relationships and dealings from his creditors," id. at ¶ 72; he made false statements about his income and expenses, particularly regarding cash payments he received from CEO Club Chapters which he failed to report as gross income for the years 2001, 2002 and 2003, id. at 74.

must be vested with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and to preserve themselves and their officers from the approach and insults of pollution."); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (stating that contempt powers are "the most prominent" of court's inherent powers "which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court"); *Sigety v. Abrams*, 632 F.2d 969, 976 (2d Cir.1980) ("The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge.").

 The power to impose civil contempt sanctions applies in Bankruptcy Court as well. Indeed, it is well established that bankruptcy courts have power to enter civil contempt orders. *In re MarketXT Holdings Corp.*, Case No. 04–12078, 2006 WL 408317, at *1 (Bankr.S.D.N.Y. Jan.27, 2006) ("It is well accepted, in light of the 2001 amendments to Rule 9020, that bankruptcy courts have power to enter civil contempt orders."); *see also In re World Parts, LLC*, 291 B.R. 248, 253 (Bankr. W.D.N.Y.2003) ("Bankruptcy courts possess the power to impose sanctions for acts of civil contempt.") (citing *In re Chateaugay Corp.*, 920 F.2d 183, 187 (2d Cir.1990)).

### B. Definition of Civil Contempt

Civil contempt is a failure to obey a court order issued for another party's benefit and such sanctions are coercive or remedial in nature. *See* BLACK'S LAW DICTIONARY 313 (7th ed.1999); *see also Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 67 S.Ct. 918, 91 L.Ed. 1117 (1947) (stating that in civil contempt, fine and imprisonment are employed "as coercive sanctions to compel the contemnor to do what the law made it his duty to do"); WRIGHT & MILLER, at § 2960 ("[T]hose [contempts of court] in which the ultimate object of the punishment is the enforcement of the rights and remedies of a litigant are civil contempts.").

### C. The Objectives of Civil Contempt

 The purpose of civil contempt is to compel a reluctant party to do what a court requires of him. *See Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir.1986); *see also Shillitani*, 384 U.S. at 368, 86 S.Ct. 1531 (stating that the act of disobedience consisted solely "in refusing to do what had been ordered" and the judgments imposed conditional imprisonment for the purpose of compelling the witnesses to obey the orders to testify). Civil contempt sanctions may also compensate for any harm that previously resulted. *See Nat'l Org. for Women v. Terry*, 159 F.3d 86, 93 (2d Cir.1998); *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996) (stating that sanctions for civil contempt serve two purposes: to coerce future compliance and to remedy any harm past noncompliance caused the other party).

### D. The Ability to Purge

The Supreme Court has found sanctions to be civil where "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus 'carries the keys of his prison in his own pocket.'" *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552 (quotation omitted); *see also Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) ("A fine that would be payable to the court is remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order."); *United States v. United Mine Workers*,

330 U.S. 258, 305, 67 S.Ct. 677, 91 L.Ed. 884 (1947) (stating that a fine would be coercive, rather than punitive, where it was "conditioned on the defendant's failure to purge itself within a reasonable time"); *see Terry,* 159 F.3d at 95 ("Where there is a purge provision, it is clear that punishment for past wrongdoing is not the objective of the fines, but rather the objective is coercion of the defendants to conform their conduct to the court's order.").

### E. Standards for Imposing Civil Contempt

█ A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply. *See King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995); *Monsanto Co. v. Haskel Trading, Inc.,* 13 F.Supp.2d 349, 363 (E.D.N.Y. 1998). "Clear and unambiguous" means that the clarity of the order must be such that it enables the enjoined party "to ascertain from the four corners of the order precisely what acts are forbidden." *Monsanto Co.,* 13 F.Supp.2d at 363; *see also Terry,* 886 F.2d at 1351–52 (finding that the order could serve as the foundation for a contempt citation because it was sufficiently specific and clear as to what acts were proscribed to enable defendants to ascertain precisely what they could and could not do).

█ "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate 'reasonable certainty' that a violation occurred." *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 250 (2d Cir.2002) (citation omitted); *see also Perez v. Danbury Hospital,* 347 F.3d 419, 423–24 (2d Cir.

2003) (stating that the evidence of noncompliance with the order must be clear and convincing).

█ Where contempt is found, the defendant must not have diligently attempted to comply with the order. *See Terry,* 886 F.2d at 1351 (finding that defendants did not diligently attempt to comply with the court order in a reasonable manner; instead the defendants proceeded with the demonstrations even though there was ample opportunity to comply with the court order either by curtailing their scope or by stopping them altogether). Any doubts whether the requirements have been met in a particular case must be resolved in favor of the party accused of the civil contempt. *See* 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 37.51 (3d ed.2006). But a finding of bad faith, willfulness, or substantial fault is not a prerequisite to a finding of civil contempt. *See* MOORE'S FEDERAL PRACTICE, at § 37.51; WRIGHT & MILLER, at § 2960 ("A violation of the decree need not be willful for a party to be held in civil contempt.").

### F. Impossibility Defense

█ Civil contempt is designed to coerce a reluctant party to obey a court's directive. *See Schoenberg v. Shapolsky Publishers, Inc.,* 971 F.2d 926, 935 (2d Cir.1992). Therefore, civil contempt is appropriate only when "obedience is within the power of the party being coerced by the order." *Schoenberg,* 971 F.2d at 935 (holding that imposition of coercive sanctions could not be upheld where attorney could not comply with the court's discovery order because he was no longer counsel to the Publishers); *see also Shillitani,* 384 U.S. at 370–71, 86 S.Ct. 1531 (stating that the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order); *Badgley,* 800 F.2d at 36

(stating that because compliance with a court's directive is the goal, an order of civil contempt is appropriate "only when it appears that obedience is within the power of the party being coerced by the order") (citation omitted); *In re Marc Rich & Co., A.G.*, 736 F.2d 864, 866 (2d Cir.1984) (stating that civil contempt is a coercive sanction, and thus a person held in civil contempt must be able to comply with the court order at issue).

A party may defend against contempt by showing that his compliance is "factually impossible." *Badgley*, 800 F.2d at 36 (stating that a court's power to impose coercive civil contempt is limited by an individual's ability to comply with the court's coercive order). Once a prima facie showing of a violation has been made, the charged party has the burden of proving his or her inability to comply. *See* WRIGHT & MILLER, at § 2960; *see also In re Marc Rich & Co., A.G.*, 736 F.2d at 866 (stating that the burden of proving "plainly and unmistakably" that compliance is impossible rests with the contemnor). In raising this defense, the defendant has the burden of production. *See id.* The burden is on the disobedient party to demonstrate circumstances beyond its control, and that it took all reasonable steps, in good faith, to comply with the underlying order. *See* MOORE'S FEDERAL PRACTICE, at § 37.51.

Mancuso did not raise impossibility as a defense in any of his pleadings or during the January 17, 2007 contempt hearing. It unquestionably was within Mancuso's power to comply with November 18 Order. Therefore, the Court concludes that the impossibility defense is inapplicable to this proceeding.

### G. Coercive Contempt Sanctions

As already stated, the purpose of a civil contempt usually is to coerce compliance with a court order, and a coercive civil contempt sanction may be conditioned on continued noncompliance. *See* MOORE'S FEDERAL PRACTICE, at § 37.51; *see, e.g., Terry*, 886 F.2d at 1351 (stating that because the sanctions, which were entirely conditional and coercive, were imposed to compel obedience to a court order, they were civil in nature).

Where the purpose is to make the defendant comply, the court must exercise its discretion in determining the proper sanction. *See United Mine Workers*, 330 U.S. at 304, 67 S.Ct. 677. The court must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about compliance with the court order. *Id.*

The court has broad discretion to fashion a coercive remedy based on the nature of the harm and the probable effect of alternative sanctions, and its determination will not be disturbed absent a clear showing of abuse. *EEOC v. Local 28, Sheet Metal Workers*, 247 F.3d 333, 336 (2d Cir.2001). Thus, when imposing coercive sanctions, a court should consider: (1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of the sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden. *See Terry*, 886 F.2d at 1353 (citing *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987)). In determining the proper sanction, "[t]he ultimate consideration is whether the coercive sanction is reasonable in relation to the facts." *See Terry*, 886 F.2d at 1351.

The classic example of a coercive, civil contempt sanction involves confining a contemnor indefinitely until he complies with an affirmative command such as an order "to pay alimony, or to surrender

property ordered to be turned over to a receiver, or to make a conveyance." *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552 (citing *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911)). In addition, imprisonment for a fixed term is coercive when the contemnor is given the option of earlier release if he complies with the court's order. *See Shillitani*, 384 U.S. at 370 n. 6, 86 S.Ct. 1531 (upholding as civil a determinate 2–year sentence which included a purge clause).

 Confinement resulting from a civil contempt proceeding is viewed as coercive if the defendant can secure his release by doing that which he was ordered to do. *See* WRIGHT & MILLER, at § 2960; *see also Shillitani*, 384 U.S. at 370, 86 S.Ct. 1531 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness to testify."). In such a circumstance, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus "carries the keys of his prison in his own pocket." *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552 (citing *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911)).

Here, the Trustee has requested a conditional order of imprisonment, giving Mancuso a short period of time to repay the money he transferred in violation of the November 18 Order, and ordering him confined if he does not do so until such time as he does comply.

## III. The November 18 Order Is Clear and Unambiguous

 The operative language of the November 18 Order "enjoined [Mancuso] without further order of the Court from transferring or diverting any property of the estate except for the payment of the wages (and corresponding payroll taxes) of three employees as specifically authorized on the November 18, 2002 record."

As discussed in Section II.E, *supra*, at 9–10, to support a finding of civil contempt, the order must be "clear and unambiguous"—the clarity of the order must be such that it enables the enjoined party "to ascertain from the four corners of the order precisely what acts are forbidden." *Monsanto Co.*, 13 F.Supp.2d at 363; *see also Terry*, 886 F.2d at 1351–52. "Transferring" is an adjective, defined as "[t]hat transfers from one place, person or thing, to another." *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. Unabridged 1959), at 2690. "Diverting" is also an adjective, defined as "serving to divert," which itself means "[t]o turn aside (from or to); to turn off from any course or intended application...." *See* Dictionary.com, *http://dictionary.com/search?q=diverting* (last visited Jan. 29, 2007). Both terms are formed from their root transitive verbs and connote some affirmative action.

The Court concludes that the November 18 Order, in clear and unambiguous language, prohibited Mancuso from undertaking (or directing others to undertake) affirmative acts transferring or diverting property of the estate, except for the payment of wages to three employees, after the November 18 Order was entered.

 The Trustee argues that even if the challenged transfers occurred before the November 18 Order was entered Mancuso nevertheless can be held in civil contempt because the November 18 Order prohibited transfers of "property of the estate," and the character of the property was not changed by the initial transfers. Therefore, the Trustee argues, any subsequent use or transfer of the property by Mancuso violated the November 18 Order. The Trustee cited no authority for his position. While the property may have remained property of the estate after the

initial transfers,[4] and may have supported legal action by the Trustee to recover the estate property, that alone would not support holding Mancuso in civil contempt. The November 18 Order only enjoined Mancuso from transferring or diverting property of the estate; it was not a turnover order requiring Mancuso to return property to the Trustee. Only affirmative acts undertaken or directed by Mancuso after the November 18 Order was entered will suffice to support a civil contempt finding.

Only one of the transfers attacked by the Trustee runs afoul of the clear and unambiguous language of the November 18 Order. Each of the transfers will be examined in turn.

## IV. The Evidence Presented at the January 17, 2007 Hearing Establishes By Clear And Convincing Evidence That Only One Transfer Violated The November 18 Order

At the January 17, 2007 evidentiary hearing, the Trustee presented the testimony of two witnesses, Gabriel Del Virginia, Esq., Debtor's counsel when the chapter 11 case was filed, and Joseph Mancuso, the respondent in this contempt proceeding. Both witnesses were cross-examined by Mancuso's counsel. Additionally, the Trustee's counsel introduced 25 exhibits, which were admitted in evidence without objection. The Trustee introduced, again without objection, excerpts from the deposition of Mancuso, taken on February 5, 2004 (PX 21). Mancuso's counsel offered a single exhibit, a $20,000 bank check, dated July 30, 2003, payable to the Trustee (DX A). An objection to this exhibit was overruled and the check was admitted in evidence.

As explained above, the applicable standard for judging civil contempt is "clear and convincing" evidence, and that is the standard the Court has applied with respect to all of its findings of fact. *See* Section II.E, *supra*, at 9–10.

### A. The $31,375 Wire Transfer Did Not Violate the November 18 Order

■■■ With respect to the $31,375 wire transfer on November 18, 2002, Mancuso admitted setting in motion the wire transfer in the days before November 18, 2002.

---

4. It is certainly true that a conversion in form of property of the estate does not change its character as property of the estate. *See Bradt v. Woodlawn Auto Workers, F.C.U.,* 757 F.2d 512, 515 (2d Cir.1985) ("[S]ection 541(a)(6) includes as property of the estate '[p]roceeds, product, offspring, rents, and profits of or from property of the estate.' 11 U.S.C. § 541(a)(6). 'Proceeds' in this context is far less limiting than it is as defined under the Uniform Commercial Code. Proceeds is 'intended to be a broad term to encompass all proceeds of property of the estate. The conversion in form of property of the estate does not change its character as property of the estate.' "); *see also Payne v. Wood,* 775 F.2d 202, 204 (7th Cir.1985), ("[O]nce property enters the estate, it does not matter whether the property changes form."); *In re FBN Food Services, Inc.,* 185 B.R. 265, 273 (N.D.Ill.1995) ("Moreover, the fact that such property is converted into another form does not necessarily remove it from the estate."); *In re Sayre,* 321 B.R. 430, 432 (Bankr. N.D.Ohio 2004) ("In this case, therefore, since the funds represented by the check were obtained from the sale of a prepetition asset which was titled in the Debtor's name, such funds fall squarely within the definition of estate property under § 541(a). Moreover, the fact that the property interest may have changed forms does not affect this result; under § 541(a)(7) as long as a fund is traceable to estate property, such fund, despite any metamorphosis, will remain estate property."); *In re Hanley,* 305 B.R. 84, 86–87 (Bankr.M.D.Fla.2003) ("[T]he scope of ... Section 541(a)(6) is quite broad, [and] encompass[es] any conversion in the form of property of the estate, and anything of value generated by property of the estate."); *In re Bracewell,* 454 F.3d 1234, 1256 (11th Cir. 2006) (same).

*See* Tr. (1/17), at 78.[5] On November 17, 2002, Mancuso sent a letter to Sheree Charles at Provident Bank requesting a wire transfer of $31,375 from CEO Clubs Acct. No. 601212729 to an account owned by CEO Clubs China Limited. *See* PX 11, Tab 2. On November 18, 2002, apparently based on the facsimile instruction sent the day before, a Provident Branch Manager prepared and signed a "Miscellaneous General Ledger Debit Ticket" ("Debit Ticket") withdrawing $31,375, plus an additional $35 as a wire transfer fee, from the Debtor's account. The Debit Ticket is not time-stamped so the time the withdrawal was initiated does not appear on the form (*see* PX 12, Tab 2, at 3). A separate Provident "TellePro Transaction Report" shows the withdrawal from the Debtor's account was made at "11:29:28" and the wire transfer was made at "11:30:15" (PX 12, Tab 3, at 2).

The Trustee relies on one additional piece of documentary evidence. Pursuant to a subpoena, the Trustee obtained from Verizon the Debtor's telephone records for November 2002 (PX 23). The telephone records show a call from the Debtor's office to Provident's office in Jersey City, New Jersey at 11:15 a.m., November 18, 2002. The Trustee offered no affirmative evidence of the parties to the call or what was discussed, but asked the Court to infer that the call was made by Mancuso, or by someone else at his direction, to determine whether the wire transfer had taken place. In his testimony, Mancuso denied being in his office when the call was made, denied speaking with anyone at Provident on November 18, 2002, and specifically denied

making or directing someone else to make the 11:15 a.m. call. *See* Tr. (1/17), at 89. Both Mancuso and Del Virginia testified that they met together in or near the Courthouse (not in the Debtor's offices) immediately after the November 18 hearing was over, but it is not clear when the court hearing ended and how long their meeting lasted. While the Court finds that Mancuso was not a credible witness, on any subject for which no irrefutable corroboration is available, Del Virginia was a credible witness on this and other subjects. Therefore, the Court is unable to conclude—and certainly not by clear and convincing evidence—that Mancuso took or directed any action on November 18, 2002, to cause the $31,375 wire transfer to be made.

 Indeed, in terms of a violation of the written November 18 Order, the ECF Docket shows that it was entered at 11:30 a.m.; the Provident bank record shows the withdrawal from the Debtor's account at 11:29:28 a.m., with the wire transfer at 11:30:15 a.m. There is no evidence of affirmative acts by Mancuso on November 18, 2002 to transfer the money, and certainly not in the 15 seconds after the November 18 Order was entered. The Court has little doubt that Mancuso knowingly and intentionally engaged in wrongful acts in his capacity as Chief Executive Officer of the debtor in possession in making at least several of the transfers involved in this matter.[6] But the issue here is whether Mancuso can be held in civil contempt for violating the November 18 Order, not whether he is or was subject to civil liability or criminal penalties for his

---

**5.** The following conventions are used in citing to the hearing record. The daily transcript is cited by date and page. For example, "Tr. (1/7), at 89" refers to page 89 of the January 17, 2007 transcript.

**6.** A debtor's officers, directors and managing employees owe the same fiduciary obligation

to creditors and shareholders as would the trustee to the creditors and the estate. *In re Centennial Textiles, Inc.,* 227 B.R. 606, 612 (Bankr.S.D.N.Y.1998) ("A debtor in possession owes the same fiduciary duty as a trustee to the creditors and the estate."); *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372

misconduct. On this record, the Court is unable to find based on clear and convincing evidence that Mancuso violated a clear and unambiguous order with respect to the $31,375 wire transfer and, thus, he cannot be held in civil contempt for it.[7]

### B. Cashing the $5,000 Check on November 18, 2002 Did Not Violate the November 18 Order

██ On November 15, 2002, Mancuso signed Check No. 15237, in the amount of

(1985) ("[I]f a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession."); *In re Centennial,* 227 B.R. at 612 ("The trustee's fiduciary obligations also fall upon the officers and managing employees who conduct the debtor in possession's affairs.") (citing *Weintraub,* 471 U.S. at 355–56, 105 S.Ct. 1986); *In re Penick Pharm., Inc.,* 227 B.R. 229, 233 (Bankr.S.D.N.Y.1998) ("[I]n the case of an inanimate debtor in possession such as a corporation, the fiduciary duties borne by a trustee for a debtor out of possession fall on the debtor's directors, officers and managing employees. . . .").

As fiduciaries, the debtor in possession and its managers are obligated to protect and conserve the debtor's property. *See In re Centennial,* 227 B.R. at 612 ("As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property") (quotations omitted); *In re Sal Caruso Cheese, Inc.,* 107 B.R. 808, 817 (Bankr.N.D.N.Y.1989) ("As a fiduciary, the debtor is obligated to protect and conserve property in its possession, as well as to provide voluntary and honest disclosure of financial information-a reasonable *'quid pro quo'* for its temporary relief from substantial financial obligations."). Accordingly, a debtor in possession's fiduciary obligation to its creditors includes refraining from acting in a manner that could damage the estate or waste its assets. *Jackson v. Levy,* No. 98 CIV. 8890, 2000 WL 124822, at *7 (S.D.N.Y. Feb.2, 2000).

For example, this Court has held that a debtor in possession's fiduciary duty parallels those imposed by § 549 of the Bankruptcy Code and that the debtor in possession and

$5,000 payable to cash and drawn on the Provident bank account (PX 12, Tab 4). Mancuso also endorsed the check on the reverse side, and either personally cashed it or had someone else do so on his behalf.[8] The Trustee's claim founders, however, because the reverse side of the check clearly shows that the check was cashed at 9:57:51 a.m. on November 18, 2002, before the November 18 Order was entered. *See id.* Thus, by cashing the check (or having someone else cash the check on his behalf),

the managers breach their fiduciary duties when they violate § 549 by making unauthorized postpetition transfers. *See, e.g., In re Centennial,* 227 B.R. at 612 (holding that debtor in possession's fiduciary duty parallels those imposed by § 549 of the Bankruptcy Code and that such duty was breached when debtor in possession and managers knowingly paid inflated invoices to permit a creditor to recover a portion of its prepetition debt in violation of § 549).

Del Virginia testified that on numerous occasions, from the time of the filing of the chapter 11 petition until the Trustee was appointed, he explained to Mancuso his fiduciary obligations as Chief Executive Officer of the debtor in possession. Mancuso denied that such conversations occurred. Del Virginia's testimony was credible; Mancuso's testimony was not. *See* Tr. (1/17), at 29–30.

7. The Trustee did not present any evidence that Mancuso took or directed others to take any affirmative acts transferring or diverting these funds after such funds were transferred to the account owned by CEO Clubs China Limited.

8. In Mancuso's testimony, he would not say whether he signed or endorsed the $5,000 check. He did nevertheless testify that he authorized or directed someone to sign and endorse it for him (Tr. (1/17), at 134). While it does not make any difference in the outcome on this transfer for the reasons explained above, the Court rejects Mancuso's denial as simply not credible. The Court has compared the signatures of all of the documents in the record that include a handwritten signature for Mancuso, and I find that Mancuso signed all of them.

Mancuso did not undertake or direct affirmative acts in violation of the November 18 Order.[9]

### C. The $20,000 Check Payable to His Minor Daughter Did Not Violate the November 18 Order

On November 8, 2002, Mancuso signed Check No. 15249, in the amount of $20,000 payable to his minor daughter, with the legend "repay loan" handwritten on the check (PX 12, Tab 5). Mancuso admitted signing this check and depositing it in his daughter's account. The reverse side of the check clearly shows that the check was processed by the bank on November 12, 2002. Mancuso, as Chief Executive Officer of the debtor in possession, should not have repaid a loan from his daughter, if in fact there was such a loan. But as with the two transfers examined above, Mancuso did not undertake or direct affirmative acts in violation of the November 18 Order since it was not entered at the time the check was written and deposited.[10]

### D. The $1,500 Check to Wells Fargo Violated the November 18 Order

Most of the checks written on the Debtor's Provident account were typewritten and manually signed. One exception was a $1,500 check, hand-dated November 16, 2002, signed by Mancuso and made payable to Wells Fargo Bank (PX 12, Tab 6). Clear and convincing evidence shows that Mancuso prepared, signed and back-dated the check. Rather than preparing and signing the check on November 16, 2002, two days *before* the November 18 Order was entered, Mancuso actually prepared and signed the check on November 19, 2002, one day *after* the November 18 Order was entered. The reverse side of the check shows that it was deposited on November 25, 2002. Mancuso testified that the check was written to pay a credit card bill. *See* Tr. (1/17), at 147. The Debtor's own Reconciliation Detail lists the check date as November 19, 2002 (PX 15, at 2). Mancuso testified that the date listed on the Reconciliation Detail is unreliable, and instead the Court should credit Mancuso's denial of back-dating. The Court concludes just the reverse: Mancuso's testimony is not credible; the Reconciliation Detail is accurate. The Reconciliation Detail also includes photocopies provided by Provident of all checks written on the Provident account (*see* PX 15). Comparing the dates on the photocopies of the checks with the dates on the Debtor's Reconciliation Detail shows that the $1,500 check is the

9. The Trustee did not present any evidence that Mancuso undertook or directed any affirmative acts transferring or diverting the $5,000 after entry of the November 18 Order. Rather, the Trustee merely established that the $5,000 was in Mancuso's custody or control at the time of the November 18 hearing. *See* Tr. (1/17), at 135.

10. The Trustee did not present any evidence that Mancuso undertook or directed any affirmative acts transferring or diverting the $20,000 deposited in his daughter's bank account after entry of the November 18 Order. The Trustee only established that the funds were deposited in his daughter's account and that Mancuso had signatory authority over the account. *See* Tr. (1/17), at 136.

Mancuso introduced into evidence over the Trustee's objection a $20,000 bank check dated July 30, 2003, which Mancuso testified he gave to the Trustee. Mancuso's testimony was confusing whether this check repaid the Trustee for the $20,000 postpetition payment to Mancuso's daughter. *Compare* Tr. (1/17), at 137 (money was turned over to the Trustee), *with* Tr. (1/17), at 166 (not a repayment to the Trustee of the $20,000 postpetition payment to his daughter). The factual question need not be resolved since the check payable to his daughter does not provide a basis to hold Mancuso in civil contempt.

only one for which the dates do not match, providing further support for the finding that Mancuso back-dated the check.

With respect to the $1,500 check, the Court concludes (1) the order Mancuso failed to comply with is clear and unambiguous, (2) the proof of Mancuso's noncompliance is clear and convincing, and (3) Mancuso did not diligently attempt in a reasonable manner to comply. *See King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.1995); *Monsanto Co. v. Haskel Trading, Inc.*, 13 F.Supp.2d 349, 363 (E.D.N.Y. 1998). To the contrary, by back-dating the check Mancuso displayed consciousness of wrongdoing and a purposeful refusal to comply with the November 18 Order. Therefore, the Court finds Mancuso in civil contempt for violation of the November 18 Order.

### E. *Mancuso Cannot Be Held in Contempt for the Two Payroll Checks to Himself and His Wife*

■■■ The Debtor apparently used a payroll service to prepare employee pay checks. Two payroll checks, both dated November 26, 2002, were paid to Mancuso and his wife in the amounts of $436.09 and $419.90, respectively. The payroll checks include Mancuso's machine-signed signature (rather than hand-written signatures). Although the November 18 Order provided a carve-out permitting payment of wages and payroll taxes of three employees of the Debtor, the Order does not specify the names of the three employees who could be paid, instead referring to the record of the hearing. The Debtor's Reconciliation Detail (PX 15) shows that five, rather than three, employee payroll checks were drawn after the November 18 Order was entered. Del Virginia, Debtor's then-counsel, testified that at the November 18, 2002 hearing, the three employees who could be

paid were identified and *did not include* Mancuso or his wife (Tr. (1/17), at 28–29). Despite the fact that this contempt proceeding has been pending since March 2004, the Trustee never ordered the November 18, 2002 hearing transcript. Without the transcript, the Court cannot conclude that Mancuso violated a clear and unambiguous order in respect of these transfers. Additionally, because the Trustee failed to raise these payroll checks as grounds for contempt prior to the January 17, 2007 hearing, *see* n. 2, *supra,* the Court concludes that the payroll checks are not properly before the Court in this contempt proceeding.

## V. Conclusion

■■■ The Court determines that the Trustee has established by clear and convincing evidence that on November 19, 2002, Mancuso wrote and back-dated the $1,500 check to Wells Fargo Bank paying a credit card bill. The language of November 18 Order was clear and unambiguous in prohibiting this transfer. Mancuso's denial regarding this transaction was not credible. Mancuso offered no defense to this transaction other than his denial. Therefore, Mancuso is hereby held in civil contempt for violating the November 18 Order.

In considering what sanction to impose, the Court has considered (1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of the sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden. *See Terry,* 886 F.2d at 1353 (citing *Dole Fresh Fruit Co. v. United Banana Co.,* 821 F.2d 106, 110 (2d Cir.1987)). A coercive sanction must be reasonable in relation to the facts. *See Terry,* 886 F.2d at 1351.

As soon as he learned that a trustee might be appointed, Mancuso set about to make a series of transfers that he would be precluded from making once a trustee was appointed. Mancuso demonstrated brazenly dishonest conduct by back-dating the check to Wells Fargo. In light of the history of this matter, the Court concludes that the only appropriate contempt sanction is a conditional order requiring Mancuso to repay the $1,500 to the Trustee; if Mancuso fails to repay the money to the Trustee before 5:00 p.m., Monday, February 12, 2007, Mancuso and his counsel shall appear before the Court at 10:00 a.m., February 13, 2007, in Courtroom 723, to show cause why he should not *immediately* be jailed *until* he repays the Trustee.

**IT IS SO ORDERED.**